IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELEMICA INC.

      *Plaintiff,*

    v.                                                   No. 1:21-cv-00893-SB

ECMARKET INC., d/b/a Conexiom Inc.

      *Defendant.*

---

John David Simmons, Keith A. Jones, PANITCH SCHWARZE BELISARIO & NADEL LLP, Wilmington, Delaware.

                                                                         *Counsel for Plaintiff.*

Steven L. Caponi, Matthew B. Goeller, Megan E. O'Connor, K&L GATES LLP, Wilmington, Delaware; Richard A. Saldinger, LANDSMAN SALDINGER CARROLL, PLLC, Chicago, Illinois.

                                                                      *Counsel for Defendant.*

### MEMORANDUM OPINION

March 28, 2023

---

BIBAS, *Circuit Judge*, sitting by designation.

    Business can be messy. Contracts get written ambiguously. Colleagues become competitors and make caustic comments about each other.

    Just so here. Elemica and ecMarket's business relationship soured, and Elemica sued. ecMarket's counterclaims, stemming from that spoiled union, are mostly viable.

So I grant in part and deny in part Elemica's motion to dismiss them. And though Elemica objects to a statement ecMarket made in its counterclaim, it fails to explain why it is prejudiced by that statement. Thus, I deny Elemica's motion to strike.

## I. BACKGROUND

Elemica provides supply-chain-management services. Countercl., D.I. 39 ¶¶ 10–11. To do so, it needed software to automate its customers' data. *Id.* ¶¶ 9, 11–12. So it contracted with ecMarket, a supply-chain software developer. *Id.* ecMarket's software created templates that would convert the customers' data into Elemica's preferred format. *Id.* ¶¶ 11–12, 19. The parties extended their contract five times. *Id.* ¶¶ 13–18.

After the fifth extension, Elemica asked ecMarket for a discount on 1,300 customer templates. *Id.* ¶ 19. Those templates were not in use, so Elemica did not want to pay for them. *Id.* ecMarket gave Elemica two options. *Id.* ¶¶ 20–21. First, the dormant templates could stay on Elemica's network, but Elemica would pay less for them over time. *Id.* ¶ 21. Second, ecMarket could wipe the templates off Elemica's network for a one-time, $65,000 fee. *Id.* By email, Elemica chose the first option. *Id.* ¶ 22. So the parties drew up an agreement. *Id.* ¶ 23.

Per that agreement, ecMarket would "apply a [monthly] credit" to Elemica's bill over the next three years. D.I. 39-1 Ex. B. That credit equaled "P × F × 1,300." *Id.* P was "the percentage applicable to the Quarter in which the month" fell, as stated in a corresponding table. *Id.* And F was "the CONEXIOM Fees that would have been payable at the end of the month before the application of the [c]redit." *Id.* ("CONEXIOM" was another name for ecMarket's services. D.I. 39 ¶ 15.)

Things went according to plan, for a time. But after about a year, Elemica decided

to remove the 1,300 dormant templates from its network itself. *Id.* ¶ 24. Unaware, ecMarket continued to discount Elemica for 1,300 active templates throughout the rest of the deal. *Id.* ¶¶ 25–26.

Meanwhile, the parties' relationship was fraying in other ways. With the agreement's end date on the horizon, ecMarket "solicit[ed] a current Elemica customer and offer[ed] that customer the opportunity to continue to use [ecMarket's services] after the [agreement's] expiration." *Id.* ¶¶ 30, 32. (As ecMarket's counterclaim explains, Elemica had entered ecMarket's line of business. *Id.* ¶¶ 9–11.)

Elemica did not take kindly to ecMarket's solicitations. It sued ecMarket for allegedly using its confidential information to poach customers. *Id.* ¶ 27; *see also* D.I. 1. And Elemica's CEO sent an email—with the complaint attached—to all its customers. D.I. 39 ¶ 33; *see also* D.I. 39-1 Ex. C. In the email, the CEO accused ecMarket of "act[ing] in such an unethical way by sending false and misleading claims to a customer" and "inappropriately contacting [the customers'] employees." D.I. 39-1 Ex. C.

I later let Elemica amend its complaint to add allegations and a deceptive-trade-practices claim. D.I. 31, at 3–5; D.I. 33. In its answer to the amended complaint, ecMarket counterclaims for breach of contract and defamation per se. D.I. 39 ¶¶ 35–48. It says Elemica breached the parties' agreement to discount the 1,300 dormant templates. *Id.* ¶ 39. And it claims that Elemica's CEO defamed it. *Id.* ¶ 42. In making its defamation counterclaim, ecMarket says that Elemica "decided … to … tortiously interfere with [a] prospective business opportunity for ecMarket" by emailing customers. D.I. 39 ¶ 32. Elemica has moved to dismiss the counterclaims and strike the

3

tortious-interference statement. D.I. 43.

I ask whether ecMarket's allegations "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

## II. THE PARTIES' AGREEMENT WAS AMBIGUOUS

A plaintiff pleading breach of contract must show (1) that a contract existed, (2) that the defendant "breach[ed] … an obligation imposed by that contract," and (3) resulting damages. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Delaware law requires me to read the contract as a whole and "enforce the plain meaning of [its] clear and unambiguous language." *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021) (Montgomery-Reeves, J.). Language is unambiguous when it can be read in only one reasonable way. *See id.* But if a term can be reasonably read in multiple ways, and is thus ambiguous, I cannot dismiss the breach claim. *Zweigenhaft v. PharMerica Corp.*, 2020 WL 5258345, at *1 (D. Del. Sept. 3, 2020) (citing *VLIW Tech.*, 840 A.2d at 615). That is because a fact-finder must resolve ambiguous terms. *See GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783–84 (Del. 2012); *Ram Const. Co. v. Am. States Ins. Co.*, 749 F.2d 1049, 1052 (3d Cir. 1984).

The parties' discount agreement was ambiguous, although the action is not where the parties think. Recall the agreed-upon credit: "P × F × 1,300." As defined, it was to equal a given percentage times the payable "CONEXIOM Fees" times "1,300." D.I. 39-1 Ex. B. ecMarket insists that "1,300" refers to the 1,300 "specific, dormant" customer templates on Elemica's network. D.I. 45, at 2, 9–10. For its part, Elemica claims

that "1,300" is simply an "Arabic number in a formula with other defined variables" and "is not subject to different interpretations." D.I. 48, at 4.

Elemica is right. 1,300 is indeed just a constant number, not a variable. Its value cannot change. It simply acts as a multiplier for $P$ (the given percentage) and $F$ ("CONEXIOM Fees").

But $F$, one of the two terms 1,300 multiplies, is ambiguous. The agreement defined $F$ as "the CONEXIOM Fees that would have been payable at the end of the month before the application of the [c]redit." D.I. 39-1 Ex. B. The capital letters suggest a defined term, but "CONEXIOM Fees" appears nowhere else. Indeed, the term was not defined or even used by the parties' original contract, which the discount agreement incorporated. *See* D.I. 13; D.I. 39-1 Ex. B. Instead, the original contract contemplated "Production Service Fees," which were to "be calculated each month according to [a corresponding table] for the number of unique [customer] relationships in production." D.I. 13, at 6–7. Because "CONEXIOM Fees" were to be multiplied by 1,300, presumably they refer to per-unit fees, rather than a total. Yet it is unclear whether those fees are per specific template, like the "1,300 specific, dormant" customer templates on Elemica's network, customer relationship, as contemplated by the original contract, or some other unit entirely. D.I. 39 ¶¶ 19–24. *Compare* D.I. 39-1 Ex. B., *with* D.I. 13, at 6–7.

I cannot tell. But at the motion-to-dismiss stage, I do not need to. *See Zweigenhaft*, 2020 WL 5258345, at *1. I can reasonably read "CONEXIOM Fees" to refer to the price of the 1,300 unused templates. Under that reasonable reading, ecMarket

5

plausibly pleads that Elemica breached the parties' agreement by getting a discount on templates for which it was supposed to pay full price. D.I. 39 ¶ 39. And that breach allegedly cost ecMarket at least $130,000. *Id.* ¶ 40. Because the parties' agreement was ambiguous, ecMarket's breach claim survives.

### III. Part of ecMarket's Defamation Claim Survives

ecMarket also alleges defamation. Under Delaware law, then, it must plead that Elemica (1) "made a defamatory statement" (2) about it (3) that was published, and (4) a "third party would understand the character of the communication as defamatory." *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005) (en banc) (citing *Read v. Carpenter*, 1995 WL 945544, at *2 (Del. Super. Ct. June 8, 1995)). A defamatory statement is one that "tends … to harm [one's] reputation," thus "lower[ing] him in the estimation of the community" or "deter[ring others] from associating or dealing with him." *Cousins v. Goodier*, 283 A.3d 1140, 1148 (Del. 2022) (en banc) (internal quotation marks omitted).

**A. ecMarket did not allege defamatory statements in Elemica's complaint**

According to ecMarket, Elemica's CEO defamed it when he emailed his customers and attached Elemica's grievance. D.I. 39 ¶¶ 33–34, 45–46. But pointing generally to the grievance is too vague. *See Grubbs v. Univ. of Del. Police Dep't*, 174 F. Supp. 3d 839, 861 (D. Del. 2016) (dismissing defamation claims when plaintiff did not "identify the exact comments" at issue). Perhaps sensing its error, ecMarket points to specific statements from the grievance in its response brief. D.I. 45, at 6. But because those statements were not alleged in its defamation counterclaim, I cannot consider them. *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir.

1988). So I dismiss without prejudice ecMarket's counterclaim to the extent that it is based on statements that Elemica made in its grievance.

### B. But it alleges defamatory statements in Elemica's email

The email, which ecMarket recounts in its counterclaim, is a different story. In it, Elemica's CEO made certain allegedly defamatory remarks:

1. "We are taking steps to address [ecMarket's] misleading statements."

2. "We want to clear up the false claim that Elemica's [service] is a 'white labeled [ecMarket]' product."

3. "I have never had a vendor, like [ecMarket], act in such an unethical way by sending false and misleading claims to a customer."

4. "[ecMarket] is inappropriately contacting your employees."

D.I. 39 ¶ 33; *see also* D.I. 39-1 Ex. C.

Elemica argues that these statements were opinions, and thus immune under Delaware law. D.I. 44, at 7–8. ecMarket counters that they were instead "false statements of fact." D.I. 45, at 14. And even if they were opinions, it continues, they "assert[ed] objective facts regarding ecMarket's conduct." *Id.* at 15–16. Each side is partly right.

As the Delaware Supreme Court recently observed, "the status of statements labeled 'opinion' in defamation law has not always been clear." *Cousins*, 283 A.3d at 1153. But two relevant propositions are clear. First, in Delaware, opinions are actionable when they "can reasonably be interpreted as stating or implying defamatory facts about an individual that are provably false." *Id.* at 1148. Second, the First Amendment protects statements that "cannot reasonably [be] interpreted as stating

7

actual facts about an individual"—speech like "rhetorical hyperbole," "imaginative expression," or "loose, figurative" language. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 16–17, 20 (1990) (internal quotation marks omitted); *accord Cousins*, 283 A.3d at 1153 & nn. 71–72.

In the first three statements, Elemica's CEO essentially accused ecMarket of dishonesty for making the "false claim that Elemica's [service] is a 'white labeled [ecMarket]' product." D.I. 39 ¶ 33. (A white-labeled product is made by one party but sold by another under the seller's brand.) That accusation rests on a fact that is "provably false": whether Elemica's service was white-labeled. *Cousins*, 283 A.3d at 1148. The same goes for the CEO's statement that ecMarket acted "unethical[ly]." D.I. 39 ¶ 33. That statement is also based on the verifiable fact that ecMarket made a false claim. So those three statements are actionable. *See Q-Tone Broad. Co. v. MusicRadio of Md., Inc.*, 1994 WL 555391, at *6 (Del. Super. Ct. Aug. 22, 1994) (holding comments that plaintiffs "lied to their listeners about the availability of concert tickets" to be actionable "statements of fact"); *cf. Sunstar Ventures, LLC v. Tigani*, 2009 WL 1231246, at *7 (Del. Super. Ct. Apr. 30, 2009) (explaining that one's "opinion that [another] breached a contract … contain[ed] many stated and implied defamatory facts as the basis of that opinion").

And they are defamatory. They "could imply that [ecMarket's] word is not to be trusted." *Sunstar Ventures*, 2009 WL 1231246, at *8. Implying that ecMarket is dishonest is also "capable of diminishing the esteem in which [it] is held, or deterring [others] from dealing with [it], and therefore [is] capable of a defamatory meaning."

8

*Id.*; *accord Q-Tone Broad.*, 1994 WL 555391, at *6. So ecMarket plausibly pleads that Elemica defamed it by claiming that ecMarket made false statements about Elemica's service.

But the fourth statement, that ecMarket was "inappropriately contacting" Elemica's customers, is protected by the First Amendment. It was "loose" and "figurative" "rhetorical hyperbole" that cannot be sued over. *Milkovich*, 497 U.S. at 16–17, 20 (internal quotation marks omitted). Unlike whether a product is white-labeled, there is no objective standard for judging whether a communication is inappropriate. *Cf. Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13–14 (1970) (holding that the description of a hard-bargaining position as "blackmail" was protected "rhetorical hyperbole"). Thus, ecMarket's defamation counterclaim based on that statement fails as a matter of law. *See Doe*, 884 A.2d at 467.

## IV. I DECLINE TO STRIKE PART OF ECMARKET'S COUNTERCLAIM

Finally, Elemica asks me to strike a statement that ecMarket made in its defamation counterclaim. D.I. 43, at 9–10. ecMarket said that Elemica "tortiously interfere[d] with [a] prospective business opportunity" by emailing its customers about the parties' dispute. D.I. 39 ¶ 32. That statement, Elemica urges, was "immaterial, impertinent, and scandalous." D.I. 44, at 9–10 (quoting Fed. R. Civ. P. 12(f)).

Motions to strike are disfavored. *See Symbol Techs., Inc. v. Aruba Networks, Inc.*, 609 F. Supp. 2d 353, 356 (D. Del. 2009). Thus, "even where the challenged material is redundant, immaterial, impertinent, or scandalous, a motion to strike should not be granted unless the presence of the surplusage will prejudice the adverse party." *Id.* at 359 (internal quotation marks omitted). Elemica's only purported prejudice is

that ecMarket's statement "tends to malign Elemica to the factfinder and the community at large." D.I. 44, at 10. That conclusory assertion about a few milquetoast words in ecMarket's counterclaim is far from the showing of "significant prejudice" that would compel me to strike the statement. *See* 5C Charles A. Wright, Arthur R. Miller & A. Benjamin Spencer, *Federal Practice and Procedure* § 1382 (3d ed. 2022). So I deny Elemica's motion to strike.

* * * * *

The parties' agreement could reasonably be read to give Elemica a discount on only 1,300 specific templates. So ecMarket plausibly alleges that Elemica breached that agreement when it failed to pay full price on 1,300 other templates. Plus, Elemica's statements that ecMarket made false claims were plausibly defamatory. In all, then, ecMarket's counterclaims mostly survive. And because Elemica fails to show prejudice from ecMarket's tortious-interference statement, I deny its motion to strike.