# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ELEMICA, INC.,<br><br>       Plaintiff,<br><br>          v.<br><br>ECMARKET, INC. d/b/a<br>CONEXIOM INC.,<br><br>       Defendant. | C.A. No. 21-893-SB |

**DEFENDANT ecMARKET, INC.'S ANSWER, AFFIRMATIVE DEFENSES
AND AMENDED COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT**

Defendant, ecMarket, Inc. ("Defendant" or "ecMarket"), by and through its undersigned

counsel, for its Answer, Affirmative Defenses and Amended Counterclaim to the Amended

Complaint filed by Plaintiff, Elemica, Inc. ("Plaintiff" or "Elemica"), states as follows:

**ANSWER**

1.     This is an action in law and equity for violation of the Defend Trade Secrets Act

and breach of the Deceptive Trade Practices Act.

**Answer:**     ecMarket admits that Plaintiff has asserted claims for alleged violations of the

Defend Trade Secrets Act and the Deceptive Trade Practices Act.  ecMarket denies that any such

claims have merit.

2.  Plaintiff Elemica is a Delaware corporation with an address at 550 East

Swedesford Road, Suite 310, Wayne, Pennsylvania 19087.

**Answer:**     ecMarket admits that Plaintiff is a Delaware corporation, but lacks knowledge or

information sufficient to admit or deny the remaining allegations in paragraph 2 of the Amended

Complaint, and on that basis, denies the same.

1

3.      Defendant ecMarket is a Delaware corporation and, upon information and belief, maintains a principal place of business at 1140 Pender Street West, Suite 1400, Vancouver, British Columbia, V6E 4G1, Canada.

**Answer:**      ecMarket admits the allegations contained in paragraph 3 of the Amended Complaint.

4.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331, 18 U.S.C. §1836 and 28 U.S.C. §1367.

**Answer:**      The allegations in paragraph 4 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket, for the purposes of this action only, admits that this Court has subject matter jurisdiction.

5.      This Court has personal jurisdiction over ecMarket because it is incorporated in Delaware.

**Answer:**      The allegations in paragraph 5 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket, for the purposes of this action only, admits that jurisdiction is proper in this Judicial District.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because ecMarket is incorporated in this judicial district and because of the Governing Law provisions the Parties agreed to in the Mutual Confidentiality Agreement described in detail *infra*.

**Answer:**      The allegations in paragraph 6 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket, for the purposes of this action only, admits that venue is proper in this Judicial District.

7.      Elemica is a leading provider of supply chain management products and services.

**Answer:**     ecMarket denies the allegations contained in paragraph 7 of the Amended Complaint except that ecMarket admits that Elemica purports to be a provider of supply chain management products and services.

8.      On September 28, 2007, Elemica and ecMarket entered into a Mutual Confidentiality Agreement (the "Mutual Confidentiality Agreement"). A true and correct copy of the Mutual Confidentiality Agreement is attached hereto as Exhibit A.

**Answer:**     ecMarket admits the allegations contained in paragraph 8 of the Amended Complaint.

9.      The Mutual Confidentiality Agreement allowed Elemica and ecMarket to exchange Confidential Information with assurances that the Receiving Party could not disclose the Confidential Information or use the Confidential Information for any purposes other than those specified by Paragraph 2(iii) of the Mutual Confidentiality Agreement.

**Answer:**     ecMarket states that the terms of the Mutual Confidentiality Agreement speak for themselves, and ecMarket denies any allegations in paragraph 9 of the Amended Complaint that are inconsistent with the terms set forth in that Agreement.

10.      Paragraph 1(a) of the Mutual Confidentiality Agreement defined Confidential Information broadly, including business affairs, business and marketing plans, data, customers, customer lists, customer needs and requirements documentation, trade secrets, prices, technology, accounting, and business systems.

**Answer:**     ecMarket states that the terms of the Mutual Confidentiality Agreement speak for themselves, and ecMarket denies any allegations in paragraph 10 of the Amended Complaint that are inconsistent with the terms set forth in that Agreement.

11.      Paragraph 2 of the Mutual Confidentiality Agreement relates to obligations of the

Receiving Party of Confidential Information and states the Receiving Party "shall: … (ii) Refrain from disclosing any Confidential Information to any person, other than to such of its employees, agents, consultants and representatives to whom disclosure is necessary in connection with the Business Relationship or the Services and who shall be informed of said terms and agree in writing to be bound by obligations at least as restrictive as those set forth herein. (iii) Use the Disclosing Party's Confidential Information solely in connection with (i) entering into the Business Relationship and (ii) the use and operation (including testing) of the Elemica Network and the Services and in connection with transactions conducted thereon."

**Answer:**      ecMarket states that the terms of the Mutual Confidentiality Agreement speak for themselves, and ecMarket denies any allegations in paragraph 11 of the Amended Complaint that are inconsistent with the terms set forth in that Agreement.

12.      Paragraph 4 of the Mutual Confidentiality Agreement states "[t]he non-disclosure and non-use obligations of this Agreement will remain in full force with respect to each item of Confidential Information for a period of five (5) years after Recipient's receipt of that item."

**Answer:**      ecMarket states that the terms of the Mutual Confidentiality Agreement speak for themselves, and ecMarket denies any allegations in paragraph 12 of the Amended Complaint that are inconsistent with the terms set forth in that Agreement.

13.      Paragraph 8(b) of the Mutual Confidentiality Agreement specifies that the state and federal courts in Delaware have exclusive jurisdiction over any controversy arising under the Mutual Confidentiality Agreement.

**Answer:**      ecMarket states that the terms of the Mutual Confidentiality Agreement speak for themselves, and ecMarket denies any allegations in paragraph 13 of the Amended Complaint that are inconsistent with the terms set forth in that Agreement.

14.     The Mutual Confidentiality Agreement has not expired or otherwise been cancelled or invalidated.

**Answer:**     ecMarket denies the allegations contained in paragraph 14 of the Amended Complaint.

15.     In November 2009, Elemica and ecMarket entered into a Rollout Agreement ("the Rollout Agreement") under which ecMarket would provide certain services to Elemica and its customers.

**Answer:**     ecMarket denies the allegations contained in paragraph 15 of the Amended Complaint except that ecMarket admits that in November 2009, ecMarket and Elemica entered into a "ERPLink Rollout Agreement," the terms of which speak for themselves.   Further answering, ecMarket states that the parties entered into multiple addenda to the Rollout Agreement.   Accordingly, ecMarket denies any allegations in paragraph 15 of the Amended Complaint inconsistent with the terms of that Rollout Agreement and the addenda to that Rollout Agreement.

16.     Under the Rollout Agreement, Elemica provides Confidential Information regarding its customers and their business to ecMarket. ecMarket provides data formatting services for Elemica and its customers.

**Answer:**     ecMarket denies the allegations contained in paragraph 16 of the Amended Complaint except that ecMarket admits that in November 2009, ecMarket and Elemica entered into a "ERPLink Rollout Agreement," the terms of which speak for themselves.     Further answering, ecMarket states that the parties entered into multiple addenda to the Rollout Agreement.   Accordingly, ecMarket denies any allegations in paragraph 16 of the Amended

Complaint inconsistent with the terms of that Rollout Agreement and the addenda to that Rollout Agreement.

17.     The Rollout Agreement explicitly incorporates and maintains the Mutual Confidentiality Agreement.

**Answer:**     ecMarket denies the allegations contained in paragraph 17 of the Amended Complaint except that ecMarket admits that in November 2009, ecMarket and Elemica entered into a "ERPLink Rollout Agreement," the terms of which speak for themselves.    Further answering, ecMarket states that the parties entered into multiple addenda to the Rollout Agreement.   Accordingly, ecMarket denies any allegations in paragraph 17 of the Amended Complaint inconsistent with the terms of that Rollout Agreement and the addenda to that Rollout Agreement.

18.     On December 18, 2009, Elemica and ecMarket executed an Addendum to the Rollout Agreement.

**Answer:**     ecMarket denies the allegations contained in paragraph 18 of the Amended Complaint except that ecMarket admits that the parties executed a document dated December 18, 2009 which purports to be a "Letter of Intent" between ecMarket and Elemica.

19.     On November 4, 2011, Elemica and ecMarket executed a Second Addendum to the Rollout Agreement.

**Answer:**     ecMarket denies the allegations contained in paragraph 19 except that ecMarket admits that the parties executed an Addendum dated November 4, 2011, which is another Addendum to the Rollout Agreement.

20.     On December 7, 2011, Elemica and ecMarket executed a Third Addendum to the Rollout Agreement.

**Answer:**      ecMarket denies the allegations contained in paragraph 20 except that ecMarket admits that the parties executed an Addendum dated December 7, 2011, which is another Addendum to the Rollout Agreement.

21.      On February 20, 2014, Elemica and ecMarket executed a Fourth Addendum to the Rollout Agreement.

**Answer:**      ecMarket denies the allegations contained in paragraph 21 except that ecMarket admits that the parties executed an Addendum dated February 20, 2014, which is another Addendum to the Rollout Agreement.

22.      On August 1, 2016, Elemica and ecMarket executed a Fifth Addendum to the Rollout Agreement.

**Answer:**      ecMarket denies the allegations contained in paragraph 22 except that ecMarket admits that the parties executed an Addendum dated July 1, 2016, which is another Addendum to the Rollout Agreement.

23.      On February 9, 2018, Elemica and ecMarket executed a Sixth Addendum to the Rollout Agreement.

**Answer:**      ecMarket denies the allegations contained in paragraph 23 except that ecMarket admits that the parties executed an Addendum dated February 5, 2018, which is another Addendum to the Rollout Agreement.

24.      On July 19, 2019, Elemica and ecMarket executed a Seventh Addendum to the Rollout Agreement.

**Answer:**      ecMarket denies the allegations contained in paragraph 24 except that ecMarket admits that the parties executed an Addendum dated July 16, 2019, which is another Addendum to the Rollout Agreement.

25.     Through the Addenda, the Rollout Agreement is valid until March 1, 2022, and none of the Addenda override the Mutual Confidentiality Agreement.

**Answer:**      ecMarket denies the allegations contained in paragraph 25 except that ecMarket admits that the Rollout Agreement expired on March 1, 2022.  Further answering, ecMarket states that the terms contained in the Rollout Agreement and the multiple Addenda to the Rollout Agreement speak for themselves, and ecMarket denies any allegations in paragraph 25 of the Amended Complaint that are inconsistent with the terms contained in the Rollout Agreement and Addenda thereto.

26.     Under the Mutual Confidentiality Agreement, the Rollout Agreement, and the Addenda, ecMarket received and continues to receive Confidential Information from Elemica and its customers, including BASF, Dupont, Lanxess, and others. This Confidential Information included not only the customers' names, but also the customers' needs and requirements, data, software, pricing, and their business systems. ecMarket processed well over two hundred thousand individual messages over the past twelve months and each message includes Confidential Information from Elemica and its customers. Processing of many of the messages involve proprietary mapping protocols that are designed for individual customers and documents.

**Answer:**      ecMarket denies the allegations contained in paragraph 26 of the Amended Complaint except ecMarket admits that prior to March 2, 2022, ecMarket processed purchase orders for certain customers using mapping protocols developed and maintained by ecMarket.

27.     Upon information and belief, ecMarket has used this Confidential Information to solicit at least BASF, Dupont and Lanxess in connection with efforts to divert business from Elemica to ecMarket.

8

**Answer:**      ecMarket denies the allegations contained in paragraph 27 of the Amended Complaint.

28.      Upon information and belief, ecMarket's misuse of Elemica's Confidential Information has at all relevant times been willful and malicious.

**Answer:**      ecMarket denies the allegations contained in paragraph 28 of the Amended Complaint.

29.      On November 3, 2021, ecMarket emailed Olin Corp. ("Olin Email"), a customer of Elemica, to solicit Olin Corp.'s ("Olin") business. The Olin Email is attached hereto as Exhibit B.

**Answer:**      ecMarket denies the allegations contained in paragraph 29 of the Amended Complaint except that ecMarket admits that on November 3, 2021, Ryan Backes sent an email to "Steve" at Olin Corp., and that a redacted copy of that email is attached as Exhibit B to the Amended Complaint.

30.      In the Olin Email, ecMarket claimed that "Olin is leveraging a service through Elemica called 'Quick Link', that service is actually white labeled Conexiom." The November 3 Email also states, "[b]eginning 2022 we are ending the relationship with Elemica that supports that Quick Link solution." The email further indicated it was sent "so we can discuss how to start the relationship directly with Conexiom (instead of through Elemica) and make sure there isn't a disruption in service. It is my understanding that we have around 10 of your customers running through that order automation solution."

**Answer:**      ecMarket denies the allegations contained in paragraph 30 of the Amended Complaint except that ecMarket admits that a redacted copy of the Olin Email is attached as

Exhibit B to the Amended Complaint and that Exhibit B speaks for itself, and ecMarket denies any allegations in paragraph 30 of the Amended Complaint inconsistent with Exhibit B

31.     The statements in the preceding paragraph are false and misleading. "QuickLink" is not a white-labeled Conexiom product.  Rather, Conexiom is an Elemica vendor that provides a portion of the overall service provided by Elemica's QuickLink product. The Conexiom service is a small portion of the overall service provided by Elemica's QuickLink product and is provided for a small portion of Elemica's customers who utilize the QuickLink product.

**Answer:**     ecMarket denies the allegations contained in paragraph 31 of the Amended Complaint.

32.     The statements in the Olin Email were also made in connection with ecMarket's attempts to solicit Elemica's customers, discloses confidential information, including the number of Olin's customers that utilize the Conexiom service in Elemica's QuickLink service, in violation of the Mutual Confidentiality Agreement and falsely speculates that there will be "a disruption in service" if Olin does not "start the relationship directly with Conexiom." Elemica's QuickLink service will not be disrupted without the Conexiom service at the beginning of 2022 as the Conexiom service may be and is being replaced by Elemica's own solution.

**Answer:**     ecMarket denies the allegations contained in paragraph 32 of the Amended Complaint.

33.     On November 3, 2021, ecMarket emailed DuPont de Nemours, Inc. ("DuPont Email"), a customer of Elemica to solicit DuPont de Nemours, Inc.'s ("DuPont") business. The DuPont email is attached hereto as Exhibit C.

**Answer:**     ecMarket denies the allegations contained in paragraph 33 of the Amended Complaint except that ecMarket admits that on November 3, 2021, Hank Lish emailed Sabrina

Williams at DuPont, and that a copy of that email is attached as Exhibit C to the Amended Complaint.

34.     In the DuPont Email, ecMarket claimed "DuPont is using Conexiom through Elemica to automate sales orders. I was recently informed that our partnership with Elemica is ending as of March 2022 and this service will no longer be available for your organization."

**Answer:**     ecMarket denies the allegations contained in paragraph 34 of the Amended Complaint except that ecMarket admits that a copy of the DuPont Email is attached as Exhibit C to the Amended Complaint and that Exhibit C speaks for itself, and ecMarket denies any allegations in paragraph 34 of the Amended Complaint inconsistent with Exhibit C.

35.     The statements in the preceding paragraphs are misleading. Conexiom is a portion of the overall service provided by Elemica's QuickLink product that automates sales orders for Elemica's customer DuPont and other customers. Elemica's QuickLink service will be available and operational for all of Elemica's customers without Conexiom's service as the Conexiom service will be and is being replaced by Elemica's own solution.

**Answer:**     ecMarket denies the allegations contained in paragraph 35 of the Amended Complaint.

36.     The statements in the DuPont Email were also made in connection with ecMarket's attempts to solicit Elemica's customers, discloses confidential information, including speculation regarding services provided by Conexiom to Elemica and whether the services will be available to DuPont, in violation of the Mutual Confidentiality Agreement. Elemica's QuickLink service and service to DuPont will not be disrupted without Conexiom as of March 2022 as the Conexiom service may be and is being replaced by Elemica's own solution.

**Answer:**      ecMarket denies the allegations contained in paragraph 36 of the Amended Complaint.

## COUNT I
## Violation of the Defend Trade Secrets Act
## 18 U.S.C. § 1836

37.      Elemica hereby repeats and incorporates the allegations contained in Paragraphs 1 through 36 as if fully set forth herein.

**Answer:**      ecMarket hereby incorporates by reference herein its answers to paragraphs 1 through 36 of the Amended Complaint as its answer to paragraph 37 of the Amended Complaint.

38.      Elemica's Confidential Information, as described herein, are the trade secrets of Elemica and its customers.

**Answer:**      ecMarket denies the allegations contained in paragraph 38 of the Amended Complaint.

39.      ecMarket obtained these trade secrets under the Mutual Confidentiality Agreement, as described above.

**Answer:**      ecMarket denies the allegations contained in paragraph 39 of the Amended Complaint.

40.      ecMarket improperly used these trade secrets for purposes other than those set forth in the Mutual Confidentiality Agreement to solicit Elemica's customers.

**Answer:**      ecMarket denies the allegations contained in paragraph 40 of the Amended Complaint.

41.      ecMarket's improper use of the trade secrets occurred in interstate commerce.

**Answer:**      ecMarket denies the allegations contained in paragraph 41 of the Amended Complaint.

42.     Elemica has been damaged in an amount to be determined at trial through ecMarket's improper use of its and its customers' trade secrets. Elemica's damages include at least any business gained by ecMarket through use of the trade secrets and any damages suffered by Elemica through corrective efforts undertaken to correct for ecMarket's improper use of the trade secrets.

**Answer:**     The allegations in paragraph 42 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket denies the same.

## COUNT II
### Violation of the Uniform Deceptive Trade Practices Act
### 6 Del. C. § 2531 *et seq*.

43.     Elemica hereby repeats and incorporates the allegations contained in Paragraphs 1 through 36 as if fully set forth herein.

**Answer:**     ecMarket hereby incorporates by reference herein its answers to paragraphs 1 through 36 of the Amended Complaint as its answer to paragraph 43 of the Amended Complaint.

44.     ecMarket's statements, including at least the Olin Email and the DuPont Email, have been made in the course of its business.

**Answer:**     ecMarket admits that the Olin Email and the DuPont Email were both sent in the course of ecMarket's business.  ecMarket denies the remaining allegations contained in paragraph 44 of the Amended Complaint.

45.     ecMarket's statements, including at least the Olin Email representations that its products have sponsorship and characteristics that they do not have, as ecMarket's service is not a like-for-like replacement or white labeled service of Elemica's QuickLink product, and the representations in the Olin and DuPont Emails that Elemica's customers will face service

disruptions or termination, as Elemica's services will continue with or without Conexiom, are false and/or misleading.

**<u>Answer:</u>**      ecMarket denies the allegations contained in paragraph 45 of the Amended Complaint.

46.      ecMarket has therefore violated 6 Del. C. § 2532(a)(5).

**<u>Answer:</u>**      The allegations in paragraph 46 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket denies the same.

47.      ecMarket's statements, including at least the Olin Email, disparage the goods, services, and business of Elemica by falsely or misleadingly representing that Elemica's services are merely white-labeled versions of ecMarket's products, when in fact Elemica's QuickLink product includes significant intellectual property and knowhow developed by Elemica itself.

**<u>Answer:</u>**      ecMarket denies the allegations contained in paragraph 47 of the Amended Complaint.

48.      ecMarket's statements in the Olin and DuPont Emails further disparage the goods, services, and business of Elemica by falsely or misleadingly representing that Elemica's QuickLink service will face "disruption in service" if Olin does not "start the relationship directly with Conexiom" (See Exhibit B) or that "service will no longer be available to your organization," when in fact Elemica's QuickLink product will continue to operate with or without Conexiom now and in the future.

**<u>Answer:</u>**      ecMarket denies the allegations contained in paragraph 48 of the Amended Complaint.

49.      ecMarket has therefore violated 6. Del. C. § 2532(a)(8).

**Answer:**      The allegations in paragraph 49 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket denies the same.

50.     Upon information and belief, ecMarket's statements were a willful attempt to improperly divert Elemica's customers to ecMarket.

**Answer:**      ecMarket denies the allegations contained in paragraph 50 of the Amended Complaint.

51.     Elemica may be irreparably damaged if ecMarket's false and misleading statements are not halted. Elemica therefore seeks an injunction prohibiting ecMarket from claiming that any of its services are a complete, like-for-like replacement to Elemica's services or products and prohibiting ecMarket from claiming that Elemica's services or products are merely white-labeled products or services of ecMarket. Elemica further seeks an injunction prohibiting ecMarket from claiming that Elemica's QuickLink product or any of Elemica's services will be disrupted or interrupted in any way without Conexiom's service.

**Answer:**      The allegations in paragraph 51 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket denies the same.

52.     Due to ecMarket's willful violation of this Act, Elemica seeks its attorneys' fees incurred in this action.

**Answer:**      The allegations in paragraph 52 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket denies the same, except admits that Elemica is seeking the recovery of its attorneys' fees in this action.

15

53.     Pursuant to 6 Del. C. § 2533(c), Elemica will seek trebling of any monetary damages otherwise awarded in this Action.

**Answer:**     The allegations in paragraph 53 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket denies the same, except admits that Elemica is seeking the recovery of three times the amount of any monetary damages awarded to it in this action.

## DEFENDANT'S DEMAND FOR JURY TRIAL

ecMarket demands a jury trial on all issues so triable.

## AFFIRMATIVE DEFENSES

ecMarket asserts the following defenses without prejudice to the denials in this Answer, without admitting any allegations of the Amended Complaint not otherwise admitted, and without admitting or denying it bears the burden of proof as to any of them.  These additional defenses are based on the facts and information currently known to ecMarket.  ecMarket reserves the right to amend or add additional defenses, including instances of inequitable conduct, based on the facts later discovered, pled or offered.

### First Affirmative Defense

The Amended Complaint, and each purported claim asserted therein, fails to state a claim for which relief can be granted and/or fails to plead the allegations with sufficient particularity for multiple reasons including, but not limited to, Plaintiff's failure to allege that Plaintiff suffered any actual damages.  Any damages alleged by Plaintiff are purely speculative in nature.

### Second Affirmative Defense

ecMarket has engaged in all relevant activities in good faith, thereby precluding Plaintiff, even if they prevail, from recovering their reasonable attorneys' fees.

16

## AMENDED COUNTERCLAIMS

Defendant/Counter-Plaintiff, ecMarket, Inc. ("ecMarket"), by and through its undersigned counsel, for its Amended Counterclaims against Plaintiff/Counter-Defendant, Elemica, Inc. ("Elemica"), states as follows:

## NATURE OF THE ACTION

1.      This action arises out of Elemica's ongoing efforts to improperly obtain a competitive advantage over ecMarket by willfully, recklessly and maliciously making defamatory statements about ecMarket directly to potential customers in the marketplace.  Indeed, Elemica not only disseminated a copy of its meritless Complaint to all of the customers who had been utilizing the Conexiom solution, but Elemica also told these customers: (i) that ecMarket/Conexiom was "inappropriately contacting" them; (ii) that ecMarket/Conexiom was acting in an "unethical" way; and (iii) that ecMarket/Conexiom was sending "false and misleading" claims to Elemica's alleged customers.  These statements constitute defamation *per se* as the statements objectively malign ecMarket in its business, trade and profession.

2.      But, there is more.  Elemica has also breached its contractual agreement with ecMarket by failing to pay ecMarket more than $300,000 in charged fees for services rendered by ecMarket pursuant to the terms of the parties' Rollout Agreement.

3.      Through these Amended Counterclaims, ecMarket seeks compensatory and punitive damages against Elemica for its improper and tortious conduct.

## THE PARTIES

4.      ecMarket is a Delaware corporation with its principal place of business at 1140 Pender Street West, Suite 1400, Vancouver, British Columbia, V6E 4G1, Canada.

17

5.      Elemica is a Delaware corporation with its principal place of business at 550 East Swedesford Road, Suite 310, Wayne, Pennsylvania 19087.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1367.

7.      This Court has personal jurisdiction over Elemica because it is incorporated in the State of Delaware and because Elemica has subjected itself to the jurisdiction of this Court by filing its Amended Complaint against ecMarket.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c) because ecMarket is incorporated in this District.

## FACTS

### The Parties' 2009 Rollout Agreement and Addenda to the Rollout Agreement

9.      ecMarket does business as "Conexiom" and provides cloud-based supply chain document automation software solutions.  Conexiom automates the processing of purchase orders, supplier invoices, and other key documents for its customers.

10.     Elemica also purports to be a supplier of automated supply chain solutions. However, Elemica has only very recently entered this market without the benefit of being able to provide the Conexiom solution to its customers.

11.     Indeed, for the past twelve plus years, Elemica has been using the Conexiom solution as a key integral part of the supply chain management services that Elemica has been offering as a "white-labeled" solution to its customers.

12.     The contractual relationship between ecMarket and Elemica began in November 2009 when the parties entered into the "ERPLink Rollout Agreement for use by Elemica for its

Print-to-XML offering" (the "Rollout Agreement").  The stated purpose of the Rollout Agreement

(a copy of which was previously filed under seal as Dkt. No. 13) was as follows:

> To allow Elemica to engage in post-pilot rollouts of its Print-to-XML
> offering, or other such Elemica offering name, ("Print-to-XML") with
> [Customers agreed to by the parties].  Print-to-XML *requires ecmarket's
> ERPLink solution and technology* [n/k/a Conexiom] to enable the
> Customers to receive orders from their customers ("Spokecos")
> electronically via ERP Link and Elemica.

*See* Dkt. No. 13 at 1 (emphasis added).  Indeed, as a result of the Rollout Agreement,

"Elemica [was] able to resell [the Conexiom solution] in its Print-to-XML offering to its

Customers."  *Id.*

13.     On or about December 18, 2009, the parties executed an addendum to the Rollout

Agreement (the "First Addendum"), which, *inter alia*, contained a section entitled "Publicity."

The "Publicity" provision in the First Addendum allowed the parties to communicate "via a press

release the content of the [Rollout] Agreement and the First Addendum …"

14.     The original Rollout Agreement was scheduled to expire on November 24, 2011,

but the parties extended the Rollout Agreement through January 31, 2012 by executing another

addendum dated November 4, 2011 (the "Second Addendum").

15.     By executing another addendum dated December 7, 2011 (the "Third Addendum"),

the parties extended the term of the Rollout Agreement through January 31, 2013.

16.     In still another addendum dated February 20, 2014 (the "Fourth Addendum"), the

parties added a new section to the Rollout Agreement which added two "New Definitions" as

follows:

> "**CONEXIOM**" means the ecmarket brand name for the Services that ecmarket
> provides to Elemica for resale to Elemica's customers.  ERPLink was the former
> ecmarket brand name for the said Services.  For the purpose of the Agreement,
> CONEXIOM and ERPLink are to be considered as meaning one and the same
> thing.

19

> "**QuickLink Print**" and "**QuickLink Email**" means the current Elemica brand names for the Elemica service offering which is also defined as Print-to-XML in the Agreement.  For the purposes of the Agreement, QuickLink Print, QuickLink Email, and Print-to-XML are to be considered as meaning one and the same thing.

Through the Third Addendum, the parties also extended the term of the Rollout Agreement to January 31, 2017.

17.     Notably, the parties also agreed in the Fourth Addendum to add another "Publicity" section to the Rollout Agreement that expressly permitted ecMarket to "at any time publish Elemica as a partner who uses CONEXIOM as an integral part of QuickLink Print and Email."

18.     In another addendum dated July 1, 2016 (the "Fifth Addendum"), the parties extended the term of the Rollout Agreement to January 31, 2019.

19.     In an addendum dated February 5, 2018 (the "Sixth Addendum"), the parties agreed to a final extension of the term of the Rollout Agreement to March 1, 2022.

### ***The Parties Agree to Reduce the Fees for 1,300 Dormant Trading Partners***

20.     In mid-March 2019, Elemica reached out to ecMarket and requested a reduction in pricing for approximately 1,300 ***specific, dormant*** "Spokeco Maps."  A "Spokeco," as defined in the Rollout Agreement, is a customer of one of the agreed upon "Customers" (as defined in the Rollout Agreement) who received Elemica's Print-to-XML offering with the Conexiom solution. *See* Dkt. No. 13 at 1.  A "Map" is defined in the Fourth Addendum as "the Spokeco to Customer (the "S-C") specific template that defines how to convert a Spokeco's purchase order from ecmarket's proprietary XML format into Elemica's Flat File format, conforming to the business process rules required by Elemica for the Customer to whom the purchase order is being sent electronically."

20

21.     By both an email and a letter dated April 1, 2019, Elemica provided an excel spreadsheet specifically identifying and defining the 1,219 dormant and "inactive" Spokeco Maps to be moved out of ecMarket's monthly production environment.  The "Subject" line in the April 1, 2019 email from Vince Squillacioti read as follows:  "Re:  1300 Dormant Maps."  A copy of Mr. Squillacioti's April 1, 2019 email and letter are attached as <u>Exhibit A</u>.

22.     Following the receipt of Elemica's April 1, 2019 email and letter, Mark Toffoli (ecMarket's Vice-President of Sales and Development) sent an email dated April 8, 2019 to Vince Squillacioti at Elemica, and offered Elemica two options to resolve Elemica's request to remove the 1300 Dormant Maps from ecMarket's production network and reduce the billing for the specific "1,300 Trading Partners" or "Dormant Maps" identified in Elemica's spreadsheet.  Both Mr. Toffoli and Mr. Squillacioti mistakenly assumed that there were 1,300 Dormant Maps contained in Elemica's spreadsheet, even though there were actually 1,219 Spokecos identified in Elemica's spreadsheet.

23.     In his April 8, 2019 email, Mr. Toffoli offered:

Option No. 1

-   Reduce the Conexiom Fees for the 1,300 Trading Partners as follows:

    o   2019 Q2 – 75% of Production Service Fees payable on the 1,300 Trading Partners;
    o   2019 Q3 – 50% of Production Service Fees payable on the 1,300 Trading Partners;
    o   2019 Q4 – 25% of Production Service Fees payable on the 1,300 Trading Partners; and
    o   2020 – 25% of Production Service Fees payable on the 1,300 Trading Partners.

Under Option No. 1, the 1,300 Trading Partners at issue would stay in/on ecMarket's network and remain in production, but at significantly reduced service fees.  Moreover, ecMarket would not

charge any "start-up" fees if and when any of those 1,300 Trading Partners chose to re-engage and continue to place orders through Elemica using the Conexiom solution.

Option No. 2

- Elemica pays a one-time $65,000 Professional Service Fee to deactivate and remove the specific 1,300 Trading Partners at issue.

Under Option No. 2, the 1,300 Trading Partners would be removed from Elemica's network and be removed from production.  A copy of Mr. Toffoli's April 8, 2019 email is attached as Exhibit B.

24.    By email dated April 9, 2019, Elemica agreed to Option 1 and asked that the reduced fees begin on April 1, 2019.  *See* Exhibit B.  The agreement reached by the parties via email as reflected in Exhibit B did not change between April 9, 2019 and July 19, 2019 or at any other time.

25.    On or about July 17, 2019, ecMarket provided Elemica with a proposed draft of what would be the "Seventh Addendum" to the Rollout Agreement.  By mutual mistake of the parties based on the "subject" line in Mr. Squillacioti's April 1, 2019 email, the proposed Seventh Addendum mistakenly assumed that the identified number of Spokecos at issue was 1,300 rather than the actual number of 1,219 Spokecos identified in Elemica's own excel spreadsheet, which it sent to ecMarket on April 1, 2019.

26.    On July 19, 2019, upon reviewing the draft of the Seventh Addendum, Elemica's in-house counsel, Brad Delizia, sent an email to ecMarket and expressly referenced "***the*** 1,300 Dorman[t] Maps" and wanted to confirm that those specific Dormant Maps "would be counted as in Production."  *See* Exhibit C (emphasis added).  Putting aside that the actual number of Spokecos at issue was 1,219, keeping those ***specific*** Dormant Maps in ecMarket's "Production Environment" was consistent with the agreement reached by the parties via email on April 9, 2019.

22

27.    Following confirmation that Mr. Delizia's understanding was correct, the parties executed the Seventh Addendum to the Rollout Agreement.  A copy of the Seventh Addendum is attached as <u>Exhibit D</u>.

28.    The parties intended the Seventh Addendum to reflect the agreed upon discount for the 1,219 *specific* Trading Partners at issue, as identified in Elemica's own excel spreadsheet.

29.    The Seventh Addendum contained a formula providing a "Credit" to Elemica pursuant to a formula of "P x F x 1,300" with "P" being a reference to the percentage discount of either 25%, 50% or 75% and "F" being a reference to "CONEXIOM Fees," which was an undefined term.  However, per Mr. Toffoli's April 8, 2019 email, "CONEXION Fees" was the same as the monthly "Production Service Fee" (a term defined in the Rollout Agreement) charged by ecMarket to Elemica based on the number of Spokecos in ecMarket's production network during the given month.  *See* Ex. B.

30.    Consistent with "Option 1" in Mr. Toffoli's April 8, 2019 email, the Seventh Addendum reflected that beginning in the 2nd quarter of 2019, ecMarket would provide Elemica with a discount of 25% on the "CONEXIOM Fees" for the Dormant Maps that would remain in/on ecMarket's production network.  *See* Ex. D.  That discount would increase to 50% for the 3rd quarter of 2019 and then increase to 75% in the 4th quarter of 2019 and continue at the percentage discount thereafter.  *Id.*

31.    The Seventh Addendum does not reference or attach the spreadsheet of "Dormant Maps" identified in Mr. Squillacioti's April 1, 2019 email and April 1, 2019 letter.  However, the parties' agreement was that the Dormant Maps, i.e., "Inactive SpokeCos," identified in Elemica's April 1, 2019 spreadsheet would remain in production, but at a discounted rate.

32.     The Seventh Addendum, by mutual mistake of the parties, assumed that there were *1,300* Dormant Maps when in reality the parties agreed that the discount would apply to the 1,219 Dormant Maps identified in Elemica's spreadsheet.

33.     The parties never agreed to provide Elemica with a discount without regard to whether the Dormant Maps remained "in production" on ecMarket's network or were deactivated and removed from production.  Indeed, the agreement never changed after Elemica agreed to "Option 1" through Mr. Squillacioti's April 9, 2019 email.

34.     ecMarket began applying the agreed upon discount beginning in April 2019. However, as early as April 2019, Elemica directed ecMarket's service department to deactivate a number of the Dormant Maps that were supposed to remain in production per the parties' agreement.  Indeed, between April 2019 and October 2020, Elemica took the necessary steps to remove/deactivate more than 1,100 of the 1,219 Dormant Maps that were supposed to remain in/on the production network per the parties' agreement.    In essence, after agreeing to "Option 1," Elemica chose to go with Option 2 *without paying the one-time $65,000 Professional Service Fee*.

35.     Elemica never informed ecMarket's accounts payable department that it was deactivating the specific Dormant Maps/Spokecos that were supposed to remain in/on ecMarket's production network per the parties' agreement.  As a result, ecMarket continued to provide Elemica with a discount, as if all of the Dormant Maps were still in ecMarket's production network and had not been removed/deactivated.  This provided an unintended windfall to Elemica, as Elemica was effectively receiving a discount for 1,300 other, unidentified *active* Trading Partners that were not identified in Elemica's original spreadsheet.

36.     However, Elemica did more than accept the unintended and inadvertent discount from ecMarket.  Through a tortured and unintended interpretation of the Seventh Addendum, Elemica exercised "self-help" and applied an even larger discount than what was ever intended by the parties' agreement.  Indeed, Elemica applied an ongoing 75% discount to the service fees being charged for 1,300 random, ***but active***, Trading Partners.

37.     In the Fall of 2021, ecMarket directed Elemica's attention to the clear agreement reached between the parties in April 2019 through the email correspondence between Mr. Toffoli and Mr. Squillacioti.  Based on the parties' agreement, ecMarket explained to Elemica that additional monies were owed for services rendered by ecMarket pursuant to the Rollout Agreement.

38.     However, despite the clear and unambiguous agreement reached between the parties in April 2019, Elemica responded and acted in bad faith, ignored the agreement and took the position that it was entitled to a discount in the Production Service Fee of 75% beginning in the 4th quarter of 2019 for ***any*** 1,300 Maps contained in/on ecMarket's production network during the given month.  Elemica asserted in bad faith that it was entitled to such a discount without regard to whether the Dormant Maps/Inactive Spokecos identified in Elemica's April 1, 2019 spreadsheet were in/on ecMarket's production network or had been removed/deactivated.

39.     In so doing, Elemica breached both the letter and spirit of the Seventh Addendum to the Rollout Agreement, and Elemica owes ecMarket more than $300,000 in unpaid service fees charged through the first quarter of 2022.

***Elemica Brazenly Makes Defamatory Statements About ecMarket***

40.     Elemica initiated this lawsuit in June 2021 based upon the demonstrably false belief that ecMarket was using Elemica's purportedly "Confidential Information" to solicit certain customers who were at that time receiving the benefits of the Conexiom solution through Elemica.

41.     Critically, the Rollout Agreement does ***not*** include any type of non-competition clause and does not otherwise prevent ecMarket from fairly competing with Elemica for prospective customers in the marketplace at any time.

42.     Elemica is also well aware that ecMarket routinely provides its Conexiom solution directly to customers, even though Elemica was, at that time, providing the Conexiom solution as a "white-labeled" software solution to its customers.  Still further, Elemica knew that ecMarket had no need whatsoever to use any of Elemica's purportedly "confidential" information to solicit and obtain new customers.  At bottom, Elemica filed its Complaint as a transparent attempt to "chill" ecMarket's competitive efforts and unfairly prevent ecMarket from fairly competing with Elemica in the marketplace.

43.     Without any non-compete agreement between the parties and with the Rollout Agreement scheduled to expire on March 1, 2022, nothing prevented ecMarket directly and/or indirectly soliciting any and all prospective customers, including any customer who was using the Conexiom solution at that time through Elemica.

44.     The fact that those Elemica customers were using the Conexiom solution and that the Rollout Agreement was scheduled to expire (and did expire) on March 1, 2022, was not confidential information.

45.     However, when Elemica learned that ecMarket was fairly soliciting a current Elemica customer and offering that customer the opportunity to continue to use the Conexiom solution after the expiration of the Rollout Agreement, Elemica decided that it had to intervene,

26

tortiously interfere with that prospective business opportunity for ecMarket and make defamatory statements about ecMarket directly to, at a minimum, all of the Elemica customers who were currently using the Conexiom solution.

46.     More specifically, on November 9, 2021, David Muse (Elemica's Chief Executive Officer) sent an email (the "Muse Email") to, on information and belief, ***all*** of the Elemica customers benefitting from the Conexiom solution at that time.  The Muse Email ***attached a copy of Elemica's Complaint against ecMarket***, and further stated, in relevant part, as follows:

> To Our Elemica User Community,
>
> It has come to my attention that a few of you have received communications from Elemica's service provider, Conexiom, regarding potential interruption of Elemica's QuickLink service … We are taking steps to address Conexiom's misleading statements.
>
> We want to clear up the false claim that Elemica's QuickLink solution is a "white labeled Conexiom" product … Conexiom is simply an Elemica vendor doing minimal pre-processing work behind the scenes for a very small percentage of the connections.
>
> It is unfortunate that Conexiom has contacted our user community.  Elemica has filed suit against Conexiom to prevent any further legally inappropriate contact with our customers. A copy of a Complaint filed in the U.S. District Court for the District of Delaware on June 22, 2021 is attached for your reference.  To the extent that you receive any communications from Conexiom related to Elemica's services or this general subject matter, please let us know.
>
> Elemica … regrets that our vendor is inappropriately contacting your employees … In all of my years, I have never had a vendor, like Conexiom, act in such an unethical way by sending false and misleading claims to a customer … and we will absolutely not tolerate this type of conduct from a vendor.

A copy of the Muse Email is attached as <u>Exhibit E</u>.

47.     The statements made in the Complaint (attached to the Muse Email and incorporated by reference in the Muse Email) and the statements made by Mr. Muse in his email are defamatory in character, specifically refer to ecMarket/Conexiom, were published to numerous

third parties and necessarily malign ecMarket's trade, business, reputation and profession.  These statements constitute defamation *per se* under Delaware law.

## COUNTERCLAIM – COUNT I – BREACH OF CONTRACT

48.     ecMarket repeats and incorporates the allegations contained in paragraphs 1 through 47 of its Amended Counterclaims as if fully set forth herein.

49.     The Rollout Agreement, including the First, Second, Third, Fourth, Fifth, Sixth and Seventh Addenda (collectively, the "Rollout Agreement"), is a valid and enforceable contract between ecMarket and Elemica.

50.     The Rollout Agreement required Elemica to pay ecMarket the pre-production and production service fees charged by ecMarket for the pre-purchased Maps and for the Maps approved and configured for use in production to support each unique SpokeCo-Customer relationship.

51.     ecMarket performed all of its obligations to Elemica pursuant to the Rollout Agreement.

52.     Elemica breached the Rollout Agreement by failing to pay ecMarket all fees properly charged by ecMarket to Elemica for the pre-production and production services fees charged by ecMarket for active SpokeCo-Customer relationships in Elemica's network. As a direct and proximate result of Elemica's breach of the Rollout Agreement, ecMarket has been damaged in an amount in excess of $300,000.

## COUNTERCLAIM – COUNT II – REFORMATION

53.     ecMarket repeats and incorporates the allegations contained in paragraphs 1 through 52 of its Amended Counterclaims as if fully set forth herein.

54.     ecMarket and Elemica reached a definitive agreement as reflected in Elemica's acceptance of "Option 1" proposed by ecMarket.  *See* Ex. B.

55.     The definitive agreement reached by the parties was to allow the ***specific, identified*** Dormant Maps, i.e., Inactive SpokeCos, set forth in Elemica's April 1, 2019 spreadsheet to remain in/on ecMarket's production network going forward but at a discounted fee beginning in April 2019.  *Id.*

56.     However, the Seventh Addendum mistakenly failed to identify or reference the 1,219 ***specific*** Dormant Maps set forth in Elemica's spreadsheet.  Instead, through the mutual mistake of the parties, the Seventh Addendum referenced the number "1,300" instead of "1,219" (the actual number of Dormant Maps listed in Elemica's April 1, 2019 spreadsheet) and, in any and all events, failed to identify, reference or attach the specific Dormant Maps that would remain in/on ecMarket's production network per the parties' agreement.

57.     Still further, the parties' used the undefined term "CONEXIOM Fees" in the Seventh Addendum rather than use the proper term, which was "Production Service Fee," which represented the price charged to Elemica for each unique Spokeco to Customer relationship in ecMarket's production network during the given month.

58.     To the extent that the trier of fact determines that the agreement reached by the parties is consistent with ecMarket's allegations as contained herein, the Seventh Addendum should be reformed to correct the parties' mutual mistake and reflect the actual agreement reached between the parties, as reflected in <u>Exhibit B</u>.

59.     Alternatively, to the extent that the trier of fact determines that the agreement reached by the parties is consistent with ecMarket's allegations as contained herein and that Elemica knew that the Seventh Addendum did not accurately reflect that agreement but willfully

remained silent, the Seventh Addendum should be reformed to correct ecMarket's unilateral mistake and reflect the actual agreement reached between the parties, as reflected in Exhibit B.

60.     As reflected in Exhibit B, there was a specific meeting of the minds between ecMarket and Elemica regarding the Dormant Maps, i.e., Inactive SpokeCos, and how ecMarket would charge Elemica going forward with regard to those specific, clearly identified Dormant Maps.

61.     Accordingly, the Seventh Addendum should be reformed to reflect a formula consistent with the parties' agreement as follows:  Credit = P x F x 1,219 with the following clear definitions:

> "P" references the percentage discount (25%, 50% or 75%) to be applied to the "Production Service Fee" charged to Elemica by ecMarket for the number of Trading Partners/Spokecos in/on ecMarket's production network during that month;

> "F" references the Production Service Fee charged to Elemica by ecMarket for the number of Trading Partners/Maps in/on ecMarket's production network during that month; and

> "1,219" references the 1,219 Dormant Maps, i.e., Inactive Spokecos, contained in Elemica's April 1, 2019 spreadsheet.[1]

62.     Still further, following the necessary reformation of the Seventh Addendum to conform to the parties' agreement, Elemica should be found to be in breach of the reformed Seventh Addendum and in breach of the Rollout Agreement for failing to pay all amounts properly due and owing to ecMarket.

## COUNTERCLAIM - COUNT III – BREACH OF
## IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING

63.     ecMarket repeats and incorporates the allegations contained in paragraphs 1 through 62 of its Amended Counterclaims as if fully set forth herein.

---

[1] A copy of the Excel spreadsheet attached to Mr. Squillacioti's letter. Ex. A.

64.     An implied duty of good faith and fair dealing is interwoven into every contract under Delaware law.

65.     The agreement reached by the parties in April 2019, as reflected in the Seventh Addendum, obligated Elemica not to remove or deactivate from ecMarket's production network the specific Dormant Maps/"Inactive SpokeCos" identified in Elemica's own April 1, 2019 spreadsheet.

66.     The Seventh Addendum did not specifically identify, reference or attach the list of Dormant Maps/"Inactive Spokecos" identified by Elemica in its April 1, 2019 spreadsheet. However, the parties clearly understood which Dormant Maps were the subject of the Seventh Addendum.

67.     Elemica breached its contractual obligations to ecMarket by affirmatively taking steps to deactivate/remove more than 1,100 of the Dormant Maps that the parties had agreed would remain in/or ecMarket's production network but at a discounted rate.

68.     Elemica's breach of its contractual obligations to ecMarket has resulted in damages to ecMarket in excess of $300,000 in the form of unpaid services provided by ecMarket to Elemica pursuant to the Rollout Agreement.

## COUNTERCLAIM - COUNT IV - DEFAMATION *PER SE*

69.     ecMarket repeats and incorporates the allegations contained in paragraphs 1 through 68 of its Amended Counterclaims as if fully set forth herein.

70.     The Muse Email, including a copy of the Complaint which Mr. Muse attached to his email and incorporated therein by reference, contains multiple, defamatory statements and communications specifically directed against ecMarket.

71.     Those statements and communications are false, and were published to numerous third parties, and repeatedly and specifically referred to ecMarket/Conexiom by name.

72.     The third parties receiving the Muse Email and copy of the Complaint necessarily understood that the statements and communications contained therein were defamatory in character and specifically directed against ecMarket, which the third parties knew to be Conexiom.

73.     The statements and communications contained in the Muse Email and in the attached Complaint malign ecMarket's reputation, business, trade and profession, and therefore such statements and communications constitute defamation *per se* under Delaware law.

74.     By attaching a copy of its original Complaint to the Muse Email and incorporating it by reference to the recipients of the Muse Email, Elemica lost any ability it may have otherwise had to assert the litigation privilege to protect the defamatory statements contained in the Complaint.

75.     As the statements and communications contained in the Muse Email (and the attached Complaint) constitute defamation *per se*, ecMarket need not plead nor prove special damages.

76.     As a result of Elemica's tortious conduct, ecMarket is entitled to its compensatory damages, punitive damages and additional damages determined to be proper and awarded by the Court.

## PRAYER FOR RELIEF

WHEREFORE, ecMarket prays for judgment in its favor and against Elemica as follows:

A.      That the Court enter judgment against Elemica and in favor of ecMarket on the claims asserted in Elemica's Amended Complaint, and that the Amended Complaint be dismissed with prejudice;

B.      That the Court enter judgment against Elemica and in favor of ecMarket on Count I of ecMarket's Counterclaim for breach of the Rollout Agreement and award ecMarket its compensatory damages in an amount to be proven at trial;

C.      In the alternative, that the Court enter judgment against Elemica and in favor of ecMarket on Count II of ecMarket's Counterclaim, reform the Seventh Addendum so that it accurately reflects the agreement reached by the parties on April 9, 2019 as set forth in Exhibit B to this Amended Counterclaim, find Elemica in breach of the Rollout Agreement, as amended and reformed, and award ecMarket its compensatory damages in an amount to be proven at trial;

D.      That the Court enter judgment against Elemica and in favor of ecMarket on Count III of ecMarket's Counterclaim for breach of the implied covenant of good faith and fair dealing and award ecMarket its compensatory damages in an amount to be proven at trial;

E.      That the Court enter judgment against Elemica and in favor of ecMarket on Count IV of ecMarket's Counterclaim for defamation *per se*;

F.      That the Court award ecMarket compensatory damages, punitive damages and damages determined to be appropriate by this Court, including prejudgment and post-judgment interest;

G.      That the Court award ecMarket its costs in bringing this action and in defending this action, including the reasonable attorneys' fees it has incurred and will incur in prosecuting this action and defending against Elemica's claims; and

That the Court grant and/or award to ecMarket any and all further relief that the Court deems just and proper.

Dated:  February, __ 2024

**K&L GATES LLP**

*/s/*_____
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
Megan E. O'Connor (No. 6569)
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com
megan.oconnor@klgates.com

*Of Counsel:*

**LANDSMAN SALDINGER CARROLL, PLLC**
Richard A. Saldinger
Landsman Saldinger Carroll, PLLC
161 N. Clark, Ste. 1600
Chicago, IL 60601
Phone: (312) 291-4650
saldinger@lsclegal.com

*Counsel for Defendant/Counterplaintiff*
*ecMarket, Inc. d/b/a Conexiom, Inc.*

34

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ELEMICA, INC., | |
| Plaintiff, | C.A. No. 21-893-SB |
| v. | |
| ECMARKET, INC. d/b/a CONEXIOM INC., | |
| Defendant. | |

**DEFENDANT ~~ECMARKET~~ecMARKET, INC.'S ANSWER, AFFIRMATIVE DEFENSES AND ~~COUNTERCLAIM~~AMENDED COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT**

Defendant, ecMarket, Inc. ("Defendant" or "ecMarket"), by and through its undersigned counsel, for its Answer, Affirmative Defenses and Amended Counterclaim to the Amended Complaint filed by Plaintiff, Elemica, Inc. ("Plaintiff" or "Elemica"), states as follows:

**ANSWER**

1.      This is an action in law and equity for violation of the Defend Trade Secrets Act and breach of the Deceptive Trade Practices Act.

**Answer:**      ecMarket admits that Plaintiff has asserted claims for alleged violations of the Defend Trade Secrets Act and the Deceptive Trade Practices Act.  ecMarket denies that any such claims have merit.

2.   Plaintiff Elemica is a Delaware corporation with an address at 550 East Swedesford Road, Suite 310, Wayne, Pennsylvania 19087.

1

**Answer:**      ecMarket admits that Plaintiff is a Delaware corporation, but lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 2 of the Amended Complaint, and on that basis, denies the same.

3.      Defendant ecMarket is a Delaware corporation and, upon information and belief, maintains a principal place of business at 1140 Pender Street West, Suite 1400, Vancouver, British Columbia, V6E 4G1, Canada.

**Answer:**      ecMarket admits the allegations contained in paragraph 3 of the Amended Complaint.

4.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331, 18 U.S.C. §1836 and 28 U.S.C. §1367.

**Answer:**      The allegations in paragraph 4 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket, for the purposes of this action only, admits that this Court has subject matter jurisdiction.

5.      This Court has personal jurisdiction over ecMarket because it is incorporated in Delaware.

**Answer:**      The allegations in paragraph 5 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket, for the purposes of this action only, admits that jurisdiction is proper in this Judicial District.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because ecMarket is incorporated in this judicial district and because of the Governing Law provisions the Parties agreed to in the Mutual Confidentiality Agreement described in detail *infra*.

**Answer:**     The allegations in paragraph 6 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket, for the purposes of this action only, admits that venue is proper in this Judicial District.

7.     Elemica is a leading provider of supply chain management products and services.

**Answer:**     ecMarket denies the allegations contained in paragraph 7 of the Amended Complaint except that ecMarket admits that Elemica purports to be a provider of supply chain management products and services.

8.     On September 28, 2007, Elemica and ecMarket entered into a Mutual Confidentiality Agreement (the "Mutual Confidentiality Agreement"). A true and correct copy of the Mutual Confidentiality Agreement is attached hereto as Exhibit A.

**Answer:**     ecMarket admits the allegations contained in paragraph 8 of the Amended Complaint.

9.     The Mutual Confidentiality Agreement allowed Elemica and ecMarket to exchange Confidential Information with assurances that the Receiving Party could not disclose the Confidential Information or use the Confidential Information for any purposes other than those specified by Paragraph 2(iii) of the Mutual Confidentiality Agreement.

**Answer:**     ecMarket states that the terms of the Mutual Confidentiality Agreement speak for themselves, and ecMarket denies any allegations in paragraph 9 of the Amended Complaint that are inconsistent with the terms set forth in that Agreement.

10.     Paragraph 1(a) of the Mutual Confidentiality Agreement defined Confidential Information broadly, including business affairs, business and marketing plans, data, customers, customer lists, customer needs and requirements documentation, trade secrets, prices,

3

technology, accounting, and business systems.

**Answer:**      ecMarket states that the terms of the Mutual Confidentiality Agreement speak for themselves, and ecMarket denies any allegations in paragraph 10 of the Amended Complaint that are inconsistent with the terms set forth in that Agreement.

11.      Paragraph 2 of the Mutual Confidentiality Agreement relates to obligations of the Receiving Party of Confidential Information and states the Receiving Party "shall: … (ii) Refrain from disclosing any Confidential Information to any person, other than to such of its employees, agents, consultants and representatives to whom disclosure is necessary in connection with the Business Relationship or the Services and who shall be informed of said terms and agree in writing to be bound by obligations at least as restrictive as those set forth herein. (iii) Use the Disclosing Party's Confidential Information solely in connection with (i) entering into the Business Relationship and (ii) the use and operation (including testing) of the Elemica Network and the Services and in connection with transactions conducted thereon."

**Answer:**      ecMarket states that the terms of the Mutual Confidentiality Agreement speak for themselves, and ecMarket denies any allegations in paragraph 11 of the Amended Complaint that are inconsistent with the terms set forth in that Agreement.

12.      Paragraph 4 of the Mutual Confidentiality Agreement states "[t]he non-disclosure and non-use obligations of this Agreement will remain in full force with respect to each item of Confidential Information for a period of five (5) years after Recipient's receipt of that item."

**Answer:**      ecMarket states that the terms of the Mutual Confidentiality Agreement speak for themselves, and ecMarket denies any allegations in paragraph 12 of the Amended Complaint that are inconsistent with the terms set forth in that Agreement.

13.    Paragraph 8(b) of the Mutual Confidentiality Agreement specifies that the state and federal courts in Delaware have exclusive jurisdiction over any controversy arising under the Mutual Confidentiality Agreement.

**Answer:**    ecMarket states that the terms of the Mutual Confidentiality Agreement speak for themselves, and ecMarket denies any allegations in paragraph 13 of the Amended Complaint that are inconsistent with the terms set forth in that Agreement.

14.    The Mutual Confidentiality Agreement has not expired or otherwise been cancelled or invalidated.

**Answer:**    ecMarket denies the allegations contained in paragraph 14 of the Amended Complaint.

15.    In November 2009, Elemica and ecMarket entered into a Rollout Agreement ("the Rollout Agreement") under which ecMarket would provide certain services to Elemica and its customers.

**Answer:**    ecMarket denies the allegations contained in paragraph 15 of the Amended Complaint except that ecMarket admits that in November 2009, ecMarket and Elemica entered into a "ERPLink Rollout Agreement," the terms of which speak for themselves.    Further answering, ecMarket states that the parties entered into multiple addenda to the Rollout Agreement.    Accordingly, ecMarket denies any allegations in paragraph 15 of the Amended Complaint inconsistent with the terms of that Rollout Agreement and the addenda to that Rollout Agreement.

16.    Under the Rollout Agreement, Elemica provides Confidential Information regarding its customers and their business to ecMarket. ecMarket provides data formatting

services for Elemica and its customers.

**Answer:**      ecMarket denies the allegations contained in paragraph 16 of the Amended

Complaint except that ecMarket admits that in November 2009, ecMarket and Elemica entered

into a "ERPLink Rollout Agreement," the terms of which speak for themselves.      Further

answering, ecMarket states that the parties entered into multiple addenda to the Rollout

Agreement.   Accordingly, ecMarket denies any allegations in paragraph 16 of the Amended

Complaint inconsistent with the terms of that Rollout Agreement and the addenda to that Rollout

Agreement.

17.      The Rollout Agreement explicitly incorporates and maintains the Mutual

Confidentiality Agreement.

**Answer:**      ecMarket denies the allegations contained in paragraph 17 of the Amended

Complaint except that ecMarket admits that in November 2009, ecMarket and Elemica entered

into a "ERPLink Rollout Agreement," the terms of which speak for themselves.      Further

answering, ecMarket states that the parties entered into multiple addenda to the Rollout

Agreement.   Accordingly, ecMarket denies any allegations in paragraph 17 of the Amended

Complaint inconsistent with the terms of that Rollout Agreement and the addenda to that Rollout

Agreement.

18.      On December 18, 2009, Elemica and ecMarket executed an Addendum to the

Rollout Agreement.

**Answer:**      ecMarket denies the allegations contained in paragraph 18 of the Amended

Complaint except that ecMarket admits that the parties executed a document dated December 18,

2009 which purports to be a "Letter of Intent" between ecMarket and Elemica.

6

19.     On November 4, 2011, Elemica and ecMarket executed a Second Addendum to the Rollout Agreement.

**Answer:**     ecMarket denies the allegations contained in paragraph 19 except that ecMarket admits that the parties executed an Addendum dated November 4, 2011, which is another Addendum to the Rollout Agreement.

20.     On December 7, 2011, Elemica and ecMarket executed a Third Addendum to the Rollout Agreement.

**Answer:**     ecMarket denies the allegations contained in paragraph 20 except that ecMarket admits that the parties executed an Addendum dated December 7, 2011, which is another Addendum to the Rollout Agreement.

21.     On February 20, 2014, Elemica and ecMarket executed a Fourth Addendum to the Rollout Agreement.

**Answer:**     ecMarket denies the allegations contained in paragraph 21 except that ecMarket admits that the parties executed an Addendum dated February 20, 2014, which is another Addendum to the Rollout Agreement.

22.     On August 1, 2016, Elemica and ecMarket executed a Fifth Addendum to the Rollout Agreement.

**Answer:**     ecMarket denies the allegations contained in paragraph 22 except that ecMarket admits that the parties executed an Addendum dated July 1, 2016, which is another Addendum to the Rollout Agreement.

23.     On February 9, 2018, Elemica and ecMarket executed a Sixth Addendum to the Rollout Agreement.

**Answer:**       ecMarket denies the allegations contained in paragraph 23 except that ecMarket admits that the parties executed an Addendum dated February 5, 2018, which is another Addendum to the Rollout Agreement.

24.       On July 19, 2019, Elemica and ecMarket executed a Seventh Addendum to the Rollout Agreement.

**Answer:**       ecMarket denies the allegations contained in paragraph 24 except that ecMarket admits that the parties executed an Addendum dated July 16, 2019, which is another Addendum to the Rollout Agreement.

25.       Through the Addenda, the Rollout Agreement is valid until March 1, 2022, and none of the Addenda override the Mutual Confidentiality Agreement.

**Answer:**       ecMarket denies the allegations contained in paragraph 25 except that ecMarket admits that the Rollout Agreement expired on March 1, 2022.  Further answering, ecMarket states that the terms contained in the Rollout Agreement and the multiple Addenda to the Rollout Agreement speak for themselves, and ecMarket denies any allegations in paragraph 25 of the Amended Complaint that are inconsistent with the terms contained in the Rollout Agreement and Addenda thereto.

26,       Under the Mutual Confidentiality Agreement, the Rollout Agreement, and the Addenda, ecMarket received and continues to receive Confidential Information from Elemica and its customers, including BASF, Dupont, Lanxess, and others. This Confidential Information included not only the customers' names, but also the customers' needs and requirements, data, software, pricing, and their business systems. ecMarket processed well over two hundred thousand individual messages over the past twelve months and each message includes

8

Confidential Information from Elemica and its customers. Processing of many of the messages involve proprietary mapping protocols that are designed for individual customers and documents.

**Answer:**      ecMarket denies the allegations contained in paragraph 26 of the Amended Complaint except ecMarket admits that prior to March 2, 2022, ecMarket processed purchase orders for certain customers using mapping protocols developed and maintained by ecMarket.

27.      Upon information and belief, ecMarket has used this Confidential Information to solicit at least BASF, Dupont and Lanxess in connection with efforts to divert business from Elemica to ecMarket.

**Answer:**      ecMarket denies the allegations contained in paragraph 27 of the Amended Complaint.

28.      Upon information and belief, ecMarket's misuse of Elemica's Confidential Information has at all relevant times been willful and malicious.

**Answer:**      ecMarket denies the allegations contained in paragraph 28 of the Amended Complaint.

29.      On November 3, 2021, ecMarket emailed Olin Corp. ("Olin Email"), a customer of Elemica, to solicit Olin Corp.'s ("Olin") business. The Olin Email is attached hereto as Exhibit B.

**Answer:**      ecMarket denies the allegations contained in paragraph 29 of the Amended Complaint except that ecMarket admits that on November 3, 2021, Ryan Backes sent an email to "Steve" at Olin Corp., and that a redacted copy of that email is attached as Exhibit B to the Amended Complaint.

30.      In the Olin Email, ecMarket claimed that "Olin is leveraging a service through

Elemica called 'Quick Link', that service is actually white labeled Conexiom." The November 3 Email also states, "[b]eginning 2022 we are ending the relationship with Elemica that supports that Quick Link solution." The email further indicated it was sent "so we can discuss how to start the relationship directly with Conexiom (instead of through Elemica) and make sure there isn't a disruption in service. It is my understanding that we have around 10 of your customers running through that order automation solution."

**Answer:**       ecMarket denies the allegations contained in paragraph 30 of the Amended Complaint except that ecMarket admits that a redacted copy of the Olin Email is attached as Exhibit B to the Amended Complaint and that Exhibit B speaks for itself, and ecMarket denies any allegations in paragraph 30 of the Amended Complaint inconsistent with Exhibit B

31.    The statements in the preceding paragraph are false and misleading. "QuickLink" is not a white-labeled Conexiom product.  Rather, Conexiom is an Elemica vendor that provides a portion of the overall service provided by Elemica's QuickLink product. The Conexiom service is a small portion of the overall service provided by Elemica's QuickLink product and is provided for a small portion of Elemica's customers who utilize the QuickLink product.

**Answer:**       ecMarket denies the allegations contained in paragraph 31 of the Amended Complaint.

32.    The statements in the Olin Email were also made in connection with ecMarket's attempts to solicit Elemica's customers, discloses confidential information, including the number of Olin's customers that utilize the Conexiom service in Elemica's QuickLink service, in violation of the Mutual Confidentiality Agreement and falsely speculates that there will be "a disruption in service" if Olin does not "start the relationship directly with Conexiom." Elemica's

QuickLink service will not be disrupted without the Conexiom service at the beginning of 2022 as the Conexiom service may be and is being replaced by Elemica's own solution.

**Answer:**   ecMarket denies the allegations contained in paragraph 32 of the Amended Complaint.

33.   On November 3, 2021, ecMarket emailed DuPont de Nemours, Inc. ("DuPont Email"), a customer of Elemica to solicit DuPont de Nemours, Inc.'s ("DuPont") business. The DuPont email is attached hereto as Exhibit C.

**Answer:**   ecMarket denies the allegations contained in paragraph 33 of the Amended Complaint except that ecMarket admits that on November 3, 2021, Hank Lish emailed Sabrina Williams at DuPont, and that a copy of that email is attached as Exhibit C to the Amended Complaint.

34.   In the DuPont Email, ecMarket claimed "DuPont is using Conexiom through Elemica to automate sales orders. I was recently informed that our partnership with Elemica is ending as of March 2022 and this service will no longer be available for your organization."

**Answer:**   ecMarket denies the allegations contained in paragraph 34 of the Amended Complaint except that ecMarket admits that a copy of the DuPont Email is attached as Exhibit C to the Amended Complaint and that Exhibit C speaks for itself, and ecMarket denies any allegations in paragraph 34 of the Amended Complaint inconsistent with Exhibit C.

35.   The statements in the preceding paragraphs are misleading. Conexiom is a portion of the overall service provided by Elemica's QuickLink product that automates sales orders for Elemica's customer DuPont and other customers. Elemica's QuickLink service will be available and operational for all of Elemica's customers without Conexiom's service as the Conexiom

service will be and is being replaced by Elemica's own solution.

**Answer:**    ecMarket denies the allegations contained in paragraph 35 of the Amended Complaint.

36.    The statements in the DuPont Email were also made in connection with ecMarket's attempts to solicit Elemica's customers, discloses confidential information, including speculation regarding services provided by Conexiom to Elemica and whether the services will be available to DuPont, in violation of the Mutual Confidentiality Agreement. Elemica's QuickLink service and service to DuPont will not be disrupted without Conexiom as of March 2022 as the Conexiom service may be and is being replaced by Elemica's own solution.

**Answer:**    ecMarket denies the allegations contained in paragraph 36 of the Amended Complaint.

## COUNT I
### Violation of the Defend Trade Secrets Act
### 18 U.S.C. § 1836

37.    Elemica hereby repeats and incorporates the allegations contained in Paragraphs 1 through 36 as if fully set forth herein.

**Answer:**    ecMarket hereby incorporates by reference herein its answers to paragraphs 1 through 36 of the Amended Complaint as its answer to paragraph 37 of the Amended Complaint.

38.    Elemica's Confidential Information, as described herein, are the trade secrets of Elemica and its customers.

**Answer:**    ecMarket denies the allegations contained in paragraph 38 of the Amended Complaint.

39.    ecMarket obtained these trade secrets under the Mutual Confidentiality

12

Agreement, as described above.

**Answer:**      ecMarket denies the allegations contained in paragraph 39 of the Amended Complaint.

40.      ecMarket improperly used these trade secrets for purposes other than those set forth in the Mutual Confidentiality Agreement to solicit Elemica's customers.

**Answer:**      ecMarket denies the allegations contained in paragraph 40 of the Amended Complaint.

41.      ecMarket's improper use of the trade secrets occurred in interstate commerce.

**Answer:**      ecMarket denies the allegations contained in paragraph 41 of the Amended Complaint.

42.      Elemica has been damaged in an amount to be determined at trial through ecMarket's improper use of its and its customers' trade secrets. Elemica's damages include at least any business gained by ecMarket through use of the trade secrets and any damages suffered by Elemica through corrective efforts undertaken to correct for ecMarket's improper use of the trade secrets.

**Answer:**      The allegations in paragraph 42 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket denies the same.

### COUNT II
### Violation of the Uniform Deceptive Trade Practices Act
### 6 Del. C. § 2531 *et seq.*

43.      Elemica hereby repeats and incorporates the allegations contained in Paragraphs 1 through 36 as if fully set forth herein.

**Answer:**       ecMarket hereby incorporates by reference herein its answers to paragraphs 1 through 36 of the Amended Complaint as its answer to paragraph 43 of the Amended Complaint.

44.    ecMarket's statements, including at least the Olin Email and the DuPont Email, have been made in the course of its business.

**Answer:**       ecMarket admits that the Olin Email and the DuPont Email were both sent in the course of ecMarket's business.   ecMarket denies the remaining allegations contained in paragraph 44 of the Amended Complaint.

45.    ecMarket's statements, including at least the Olin Email representations that its products have sponsorship and characteristics that they do not have, as ecMarket's service is not a like-for-like replacement or white labeled service of Elemica's QuickLink product, and the representations in the Olin and DuPont Emails that Elemica's customers will face service disruptions or termination, as Elemica's services will continue with or without Conexiom, are false and/or misleading.

**Answer:**       ecMarket denies the allegations contained in paragraph 45 of the Amended Complaint.

46.    ecMarket has therefore violated 6 Del. C. § 2532(a)(5).

**Answer:**       The allegations in paragraph 46 of the Amended Complaint set forth legal conclusions for which no response is required.   To the extent any response is required, ecMarket denies the same.

47.    ecMarket's statements, including at least the Olin Email, disparage the goods, services, and business of Elemica by falsely or misleadingly representing that Elemica's services are merely white-labeled versions of ecMarket's products, when in fact Elemica's QuickLink

product includes significant intellectual property and knowhow developed by Elemica itself.

**Answer:**     ecMarket denies the allegations contained in paragraph 47 of the Amended Complaint.

48.     ecMarket's statements in the Olin and DuPont Emails further disparage the goods, services, and business of Elemica by falsely or misleadingly representing that Elemica's QuickLink service will face "disruption in service" if Olin does not "start the relationship directly with Conexiom" (See Exhibit B) or that "service will no longer be available to your organization," when in fact Elemica's QuickLink product will continue to operate with or without Conexiom now and in the future.

**Answer:**     ecMarket denies the allegations contained in paragraph 48 of the Amended Complaint.

49.     ecMarket has therefore violated 6. Del. C. § 2532(a)(8).

**Answer:**     The allegations in paragraph 49 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket denies the same.

50.     Upon information and belief, ecMarket's statements were a willful attempt to improperly divert Elemica's customers to ecMarket.

**Answer:**     ecMarket denies the allegations contained in paragraph 50 of the Amended Complaint.

51.     Elemica may be irreparably damaged if ecMarket's false and misleading statements are not halted. Elemica therefore seeks an injunction prohibiting ecMarket from claiming that any of its services are a complete, like-for-like replacement to Elemica's services

or products and prohibiting ecMarket from claiming that Elemica's services or products are merely white-labeled products or services of ecMarket. Elemica further seeks an injunction prohibiting ecMarket from claiming that Elemica's QuickLink product or any of Elemica's services will be disrupted or interrupted in any way without Conexiom's service.

**Answer:**     The allegations in paragraph 51 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket denies the same.

52.     Due to ecMarket's willful violation of this Act, Elemica seeks its attorneys' fees incurred in this action.

**Answer:**     The allegations in paragraph 52 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket denies the same, except admits that Elemica is seeking the recovery of its attorneys' fees in this action.

53.     Pursuant to 6 Del. C. § 2533(c), Elemica will seek trebling of any monetary damages otherwise awarded in this Action.

**Answer:**     The allegations in paragraph 53 of the Amended Complaint set forth legal conclusions for which no response is required.  To the extent any response is required, ecMarket denies the same, except admits that Elemica is seeking the recovery of three times the amount of any monetary damages awarded to it in this action.

## DEFENDANT'S DEMAND FOR JURY TRIAL

ecMarket demands a jury trial on all issues so triable.

## AFFIRMATIVE DEFENSES

ecMarket asserts the following defenses without prejudice to the denials in this Answer, without admitting any allegations of the Amended Complaint not otherwise admitted, and without admitting or denying it bears the burden of proof as to any of them.  These additional defenses are based on the facts and information currently known to ecMarket.  ecMarket reserves the right to amend or add additional defenses, including instances of inequitable conduct, based on the facts later discovered, pled or offered.

### First Affirmative Defense

The Amended Complaint, and each purported claim asserted therein, fails to state a claim for which relief can be granted and/or fails to plead the allegations with sufficient particularity for multiple reasons including, but not limited to, Plaintiff's failure to allege that Plaintiff suffered any actual damages.  Any damages alleged by Plaintiff are purely speculative in nature.

### Second Affirmative Defense

ecMarket has engaged in all relevant activities in good faith, thereby precluding Plaintiff, even if they prevail, from recovering their reasonable attorneys' fees.

### ~~COUNTERCLAIM~~AMENDED COUNTERCLAIMS

Defendant/Counter-Plaintiff, ecMarket, Inc. ("ecMarket"), by and through its undersigned counsel, for its ~~Counterclaim~~Amended Counterclaims against Plaintiff/Counter-Defendant, Elemica, Inc. ("Elemica"), states as follows:

### NATURE OF THE ACTION

1.    This action arises out of Elemica's ongoing efforts to improperly obtain a competitive advantage over ecMarket by willfully, recklessly and maliciously making defamatory statements about ecMarket directly to potential customers in the marketplace.

Indeed, Elemica not only disseminated a copy of its meritless Complaint to all of the customers who had been utilizing the Conexiom solution, but Elemica also told these customers: (i) that ecMarket/Conexiom was "inappropriately contacting" them; (ii) that ecMarket/Conexiom was acting in an "unethical" way; and (iii) that ecMarket/Conexiom was sending "false and misleading" claims to Elemica's alleged customers.  These statements constitute defamation *per se* as the statements objectively malign ecMarket in its business, trade and profession.

2.      But, there is more.  Elemica has also breached its contractual agreement with ecMarket by failing to pay ecMarket more than $~~130,000~~300,000 in charged fees for services rendered by ecMarket pursuant to the terms of the parties' Rollout Agreement.

3.      Through ~~this Counterclaim~~these Amended Counterclaims, ecMarket seeks compensatory and punitive damages against Elemica for its improper and tortious conduct.

## THE PARTIES

4.      ecMarket is a Delaware corporation with its principal place of business at 1140 Pender Street West, Suite 1400, Vancouver, British Columbia, V6E 4G1, Canada.

5.      Elemica is a Delaware corporation with its principal place of business at 550 East Swedesford Road, Suite 310, Wayne, Pennsylvania 19087.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1367.

7.      This Court has personal jurisdiction over Elemica because it is incorporated in the State of Delaware and because Elemica has subjected itself to the jurisdiction of this Court by filing its Amended Complaint against ecMarket.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c) because ecMarket is incorporated in this District.

## FACTS

### *The Parties' 2009 Rollout Agreement and Addenda to the Rollout Agreement*

9.      ecMarket does business as "Conexiom" and provides cloud-based supply chain document automation software solutions.  Conexiom automates the processing of purchase orders, supplier invoices, and other key documents for its customers.

10.     Elemica also purports to be a supplier of automated supply chain solutions. However, Elemica has only very recently entered this market without the benefit of being able to provide the Conexiom solution to its customers.

11.     Indeed, for the past twelve plus years, Elemica has been using the Conexiom solution as a key integral part of the supply chain management services that Elemica has been offering as a "white-labeled" solution to its customers.

12.     The contractual relationship between ecMarket and Elemica began in November 2009 when the parties entered into the "ERPLink Rollout Agreement for use by Elemica for its Print-to-XML offering" (the "Rollout Agreement").   The stated purpose of the Rollout Agreement (a copy of which was previously filed under seal as Dkt. No. 13) was as follows:

> To allow Elemica to engage in post-pilot rollouts of its Print-to-XML offering, or other such Elemica offering name, ("Print-to-XML") with [Customers agreed to by the parties].  Print-to-XML ***requires ecmarket's ERPLink solution and technology*** [n/k/a Conexiom] to enable the Customers to receive orders from their customers ("Spokecos") electronically via ERP Link and Elemica.

*See* Dkt. No. 13 at 1 (emphasis added).  Indeed, as a result of the Rollout Agreement, "Elemica [was] able to resell [the Conexiom solution] in its Print-to-XML offering to its Customers."  *Id.*

13.    On or about December 18, 2009, the parties executed an addendum to the Rollout Agreement (the "First Addendum"), which, *inter alia*, contained a section entitled "Publicity." The "Publicity" provision in the First Addendum allowed the parties to communicate "via a press release the content of the [Rollout] Agreement and the First Addendum …"

14.    ~~13.~~ The original Rollout Agreement was scheduled to expire on November 24, 2011, but the parties extended the Rollout Agreement through January 31, 2012 by executing ~~an~~another addendum dated November 4, 2011 (the "~~First~~Second Addendum").

15.    ~~14.~~ By executing another addendum dated December 7, 2011 (the "~~Second~~Third Addendum"), the parties extended the term of the Rollout Agreement through January 31, 2013.

16.    ~~15.~~ In still another addendum dated February 20, 2014 (the "~~Third~~Fourth Addendum"), the parties added a new section to the Rollout Agreement which added two "New Definitions" as follows:

> "**CONEXIOM**" means the ecmarket brand name for the Services that ecmarket provides to Elemica for resale to Elemica's customers.  ERPLink was the former ecmarket brand name for the said Services.  For the purpose of the Agreement, CONEXIOM and ERPLink are to be considered as meaning one and the same thing.

> "**QuickLink Print**" and "**QuickLink Email**" means the current Elemica brand names for the Elemica service offering which is also defined as Print-to-XML in the Agreement.  For the purposes of the Agreement, QuickLink Print, QuickLink Email, and Print-to-XML are to be considered as meaning one and the same thing.

Through the Third Addendum, the parties also extended the term of the Rollout Agreement to January 31, 2017.

17.   ~~16.~~ Notably, the parties also agreed in the ~~Third~~Fourth Addendum to add ~~a~~another "Publicity" section to the Rollout Agreement that expressly permitted ecMarket to "at any time publish Elemica as a partner who uses CONEXIOM as an integral part of QuickLink Print and Email."

18.   ~~17.~~ In another addendum dated July 1, 2016 (the "~~Fourth~~Fifth Addendum"), the parties extended the term of the Rollout Agreement to January 31, 2019.

19.   ~~18.~~ In an addendum dated February 5, 2018 (the "~~Fifth~~"Sixth Addendum"), the parties agreed to a final extension of the term of the Rollout Agreement to March 1, 2022.

### *The Parties Agree to Reduce the Fees for 1,300 Dormant Trading Partners*

~~19.~~ In mid-March 2019, Elemica reached out to ecMarket and requested a reduction in pricing for approximately 1,300 *specific, dormant* "Spokeco Maps."  A "Spokeco," as defined in the Rollout Agreement, is a customer of one of the agreed upon "Customers" (as defined in the Rollout Agreement) who received Elemica's Print-to-XML offering with the Conexiom solution. *See* Dkt. No. 13 at 1.  A "Map" is defined in the ~~Third~~Fourth Addendum as "the Spokeco to Customer (the "S-C") specific template that defines how to convert a Spokeco's purchase order from ecmarket's proprietary XML format into Elemica's Flat File format, conforming to the business process rules required by Elemica for the Customer to whom the purchase order is being sent electronically."

20.   By both an email and a letter dated April 1, 2019, Elemica provided an excel spreadsheet specifically identifying and defining the ~~1,300~~1,219 dormant and "inactive" Spokeco

Maps to be moved out of ecMarket's monthly production environment.  ~~A copy of Elemica's letter dated~~The "Subject" line in the April 1, 2019 ~~is~~email from Vince Squillacioti read as follows:  "Re:  1300 Dormant Maps."  A copy of Mr. Squillacioti's April 1, 2019 email and letter are attached as <u>Exhibit A</u>.

21.   ~~20.~~ Following the receipt of Elemica's April 1, 2019 email and letter, Mark Toffoli (ecMarket's Vice-President of Sales and Development) sent an email dated April 8, 2019 to Vince Squillacioti at Elemica, and offered Elemica two options to resolve Elemica's request to remove the 1300 Dormant Maps from ecMarket's production network and reduce the billing for the specific "1,300 Trading Partners" or "Dormant Maps" identified in Elemica's spreadsheet. Both Mr. Toffoli and Mr. Squillacioti mistakenly assumed that there were 1,300 Dormant Maps contained in Elemica's spreadsheet, even though there were actually 1,219 Spokecos identified in Elemica's spreadsheet.

22.   ~~21.~~ In his April 8, 2019 email, Mr. Toffoli offered:

Option No. 1

- Reduce the Conexiom Fees for the 1,300 Trading Partners as follows:

  o 2019 Q2 – 75% of Production Service Fees payable on the 1,300 Trading Partners;
  o 2019 Q3 – 50% of Production Service Fees payable on the 1,300 Trading Partners;
  o 2019 Q4 – 25% of Production Service Fees payable on the 1,300 Trading Partners; and
  o 2020 – 25% of Production Service Fees payable on the 1,300 Trading Partners.

Under Option No. 1, the 1,300 Trading Partners at issue would stay ~~on Elemica's~~in/on ecMarket's network and remain in production, but at significantly reduced service fees.

Moreover, ecMarket would not charge any "start-up" fees if and when any of those 1,300 Trading Partners chose to re-engage and continue to place orders through Elemica using the Conexiom solution.

Option No. 2

- Elemica pays a one-time $65,000 Professional Service Fee to deactivate and remove the specific 1,300 Trading Partners at issue.

Under Option No. 2, the 1,300 Trading Partners would be removed from Elemica's network and be removed from production.  A copy of Mr. Toffoli's April 8, 2019 email is attached as Exhibit B.

23.    22. By email dated April 9, 2019, Elemica agreed to Option 1 and asked that the reduced fees begin on April 1, 2019.  *See* Exhibit B.  The agreement reached by the parties via email as reflected in Exhibit B did not change between April 9, 2019 and July 19, 2019 or at any other time.

23. Following the parties reaching an agreement via email, the parties executed an addendum dated July 16, 2019 to the Rollout Agreement (the "Sixth Addendum"), which the parties intended to reflect the agreed upon discount for the 1,300 *specific* Trading Partners at issue, as reflected in Elemica's own excel spreadsheet.  A copy of the Sixth Addendum is attached as Exhibit B.

24.    On or about July 17, 2019, ecMarket provided Elemica with a proposed draft of what would be the "Seventh Addendum" to the Rollout Agreement.  By mutual mistake of the parties based on the "subject" line in Mr. Squillacioti's April 1, 2019 email, the proposed Seventh Addendum mistakenly assumed that the identified number of Spokecos at issue was

1,300 rather than the actual number of 1,219 Spokecos identified in Elemica's own excel spreadsheet, which it sent to ecMarket on April 1, 2019.

25.     On July 19, 2019, upon reviewing the draft of the Seventh Addendum, Elemica's in-house counsel, Brad Delizia, sent an email to ecMarket and expressly referenced "*the* 1,300 Dorman[t] Maps" and wanted to confirm that those specific Dormant Maps "would be counted as in Production."  *See* Exhibit C (emphasis added).  Putting aside that the actual number of Spokecos at issue was 1,219, keeping those *specific* Dormant Maps in ecMarket's "Production Environment" was consistent with the agreement reached by the parties via email on April 9, 2019.

26.     Following confirmation that Mr. Delizia's understanding was correct, the parties executed the Seventh Addendum to the Rollout Agreement.  A copy of the Seventh Addendum is attached as Exhibit D.

27.     The parties intended the Seventh Addendum to reflect the agreed upon discount for the 1,219 *specific* Trading Partners at issue, as identified in Elemica's own excel spreadsheet.

28.     The Seventh Addendum contained a formula providing a "Credit" to Elemica pursuant to a formula of "P x F x 1,300" with "P" being a reference to the percentage discount of either 25%, 50% or 75% and "F" being a reference to "CONEXIOM Fees," which was an undefined term.  However, per Mr. Toffoli's April 8, 2019 email, "CONEXION Fees" was the same as the monthly "Production Service Fee" (a term defined in the Rollout Agreement) charged by ecMarket to Elemica based on the number of Spokecos in ecMarket's production network during the given month.  *See* Ex. B.

24

29.     Consistent with "Option 1" in Mr. Toffoli's April 8, 2019 email, the Seventh Addendum reflected that beginning in the 2nd quarter of 2019, ecMarket would provide Elemica with a discount of 25% on the "CONEXIOM Fees" for the Dormant Maps that would remain in/on ecMarket's production network.  *See* Ex. D.  That discount would increase to 50% for the 3rd quarter of 2019 and then increase to 75% in the 4th quarter of 2019 and continue at the percentage discount thereafter.  *Id.*

30.     The Seventh Addendum does not reference or attach the spreadsheet of "Dormant Maps" identified in Mr. Squillacioti's April 1, 2019 email and April 1, 2019 letter.  However, the parties' agreement was that the Dormant Maps, i.e., "Inactive SpokeCos," identified in Elemica's April 1, 2019 spreadsheet would remain in production, but at a discounted rate.

31.     The Seventh Addendum, by mutual mistake of the parties, assumed that there were *1,300* Dormant Maps when in reality the parties agreed that the discount would apply to the 1,219 Dormant Maps identified in Elemica's spreadsheet.

32.     The parties never agreed to provide Elemica with a discount without regard to whether the Dormant Maps remained "in production" on ecMarket's network or were deactivated and removed from production.  Indeed, the agreement never changed after Elemica agreed to "Option 1" through Mr. Squillacioti's April 9, 2019 email.

33.     ~~24.~~ ecMarket began applying the agreed upon discount ~~for the specific 1,300 Trading Partners~~ beginning in April 2019.  However, ~~in or around September 2020 through the end of 2020, Elemica decided to "deactivate" those 1,300 Trading Partners and completely remove them from the Elemica network~~ as early as April 2019, Elemica directed ecMarket's service department to deactivate a number of the Dormant Maps that were supposed to remain in

25

production per the parties' agreement.  Indeed, between April 2019 and October 2020, Elemica took the necessary steps to remove/deactivate more than 1,100 of the 1,219 Dormant Maps that were supposed to remain in/on the production network per the parties' agreement.    In essence, after agreeing to "Option 1," Elemica chose to go with Option 2 *without paying the one-time $65,000 Professional Service Fee*.

34.    25. Inadvertently, beginning in the fourth quarter of 2020 and continuing through the first quarter of 2022Elemica never informed ecMarket's accounts payable department that it was deactivating the specific Dormant Maps/Spokecos that were supposed to remain in/on ecMarket's production network per the parties' agreement.  As a result, ecMarket continued to provide Elemica with a discount, as if the 1,300 Trading Partnersall of the Dormant Maps were still in Elemica'secMarket's production network and had not been removed/deactivated.  This provided an unintended windfall to Elemica, as Elemica was effectively receiving a discount for 1,300 other, unidentified *active* Trading Partners that were not part ofidentified in Elemica's original spreadsheet (which contained the 1,300 Trading Partners being taken out of production in April 2019).

26. However, Elemica did more than accept the unintended and inadvertent discount from ecMarket.  Through a tortured and unintended interpretation of the SixthSeventh Addendum, Elemica exercised "self-help" and applied an even larger discount than what was ever intended by the parties' agreement.  Indeed, Elemica applied an ongoing 75% discount to the service fees being charged for 1,300 random, *but active*, Trading Partners.  In

35.    In the Fall of 2021, ecMarket directed Elemica's attention to the clear agreement reached between the parties in April 2019 through the email correspondence between Mr. Toffoli

and Mr. Squillacioti.  Based on the parties' agreement, ecMarket explained to Elemica that additional monies were owed for services rendered by ecMarket pursuant to the Rollout Agreement.

36.    However, despite the clear and unambiguous agreement reached between the parties in April 2019, Elemica responded and acted in bad faith, ignored the agreement and took the position that it was entitled to a discount in the Production Service Fee of 75% beginning in the 4th quarter of 2019 for *any* 1,300 Maps contained in/on ecMarket's production network during the given month.  Elemica asserted in bad faith that it was entitled to such a discount without regard to whether the Dormant Maps/Inactive Spokecos identified in Elemica's April 1, 2019 spreadsheet were in/on ecMarket's production network or had been removed/deactivated.

37.    In so doing, Elemica breached both the letter and spirit of the ~~Sixth~~Seventh Addendum to the Rollout Agreement, and Elemica owes ecMarket more than $~~130,000~~300,000 in unpaid service fees charged through the first quarter of 2022.

***Elemica Brazenly Makes Defamatory Statements About ecMarket***

38.    ~~27.~~Elemica initiated this lawsuit in June 2021 based upon the demonstrably false belief that ecMarket was using Elemica's purportedly "Confidential Information" to solicit certain customers who were at that time receiving the benefits of the Conexiom solution through Elemica.

39.    ~~28.~~Critically, the Rollout Agreement does ***not*** include any type of non-competition clause and does not otherwise prevent ecMarket from fairly competing with Elemica for prospective customers in the marketplace at any time.

40. 29. Elemica is also well aware that ecMarket routinely provides its Conexiom solution directly to customers, even though Elemica was, at that time, providing the Conexiom solution as a "white-labeled" software solution to its customers.  Still further, Elemica knew that ecMarket had no need whatsoever to use any of Elemica's purportedly "confidential" information to solicit and obtain new customers.  At bottom, Elemica filed its Complaint as a transparent attempt to "chill" ecMarket's competitive efforts and unfairly prevent ecMarket from fairly competing with Elemica in the marketplace.

41. 30. Without any non-compete agreement between the parties and with the Rollout Agreement scheduled to expire on March 1, 2022, nothing prevented ecMarket directly and/or indirectly soliciting any and all prospective customers, including any customer who was using the Conexiom solution at that time through Elemica.

42. 31. The fact that those Elemica customers were using the Conexiom solution and that the Rollout Agreement was scheduled to expire (and did expire) on March 1, 2022, was not confidential information.

43. 32. However, when Elemica learned that ecMarket was fairly soliciting a current Elemica customer and offering that customer the opportunity to continue to use the Conexiom solution after the expiration of the Rollout Agreement, Elemica decided that it had to intervene, tortiously interfere with that prospective business opportunity for ecMarket and make defamatory statements about ecMarket directly to, at a minimum, all of the Elemica customers who were currently using the Conexiom solution.

44. 33. More specifically, on November 9, 2021, David Muse (Elemica's Chief Executive Officer) sent an email (the "Muse Email") to, on information and belief, *all* of the

28

Elemica customers benefitting from the Conexiom solution at that time.  The Muse Email **attached a copy of Elemica's Complaint against ecMarket**, and further stated, in relevant part, as follows:

> To Our Elemica User Community,
>
> It has come to my attention that a few of you have received communications from Elemica's service provider, Conexiom, regarding potential interruption of Elemica's QuickLink service … We are taking steps to address Conexiom's misleading statements.
>
> We want to clear up the false claim that Elemica's QuickLink solution is a "white labeled Conexiom" product … Conexiom is simply an Elemica vendor doing minimal pre-processing work behind the scenes for a very small percentage of the connections.
>
> It is unfortunate that Conexiom has contacted our user community.  Elemica has filed suit against Conexiom to prevent any further legally inappropriate contact with our customers.  A copy of a Complaint filed in the U.S. District Court for the District of Delaware on June 22, 2021 is attached for your reference.  To the extent that you receive any communications from Conexiom related to Elemica's services or this general subject matter, please let us know.
>
> Elemica … regrets that our vendor is inappropriately contacting your employees … In all of my years, I have never had a vendor, like Conexiom, act in such an unethical way by sending false and misleading claims to a customer … and we will absolutely not tolerate this type of conduct from a vendor.

A copy of the Muse Email is attached as Exhibit ~~C~~E.

45. ~~34.~~ The statements made in the Complaint (attached to the Muse Email and incorporated by reference in the Muse Email) and the statements made by Mr. Muse in his email are defamatory in character, specifically refer to ecMarket/Conexiom, were published to numerous third parties and necessarily malign ecMarket's trade, business, reputation and profession.  These statements constitute defamation *per se* under Delaware law.

## COUNTERCLAIM – COUNT I – BREACH OF CONTRACT

46.   35. ecMarket repeats and incorporates the allegations contained in paragraphs 1 through 3447 of its CounterclaimAmended Counterclaims as if fully set forth herein.

47.   36. The Rollout Agreement, including the First, Second, Third, Fourth, Fifth and, Sixth and Seventh Addenda (collectively, the "Rollout Agreement"), is a valid and enforceable contract between ecMarket and Elemica.

48.   37. The Rollout Agreement required Elemica to pay ecMarket the pre-production and production service fees charged by ecMarket for the pre-purchased Maps and for the Maps approved and configured for use in production to support each unique SpokeCo-Customer relationship.

49.   38. ecMarket performed all of its obligations to Elemica pursuant to the Rollout Agreement.

50.   39. Elemica breached the Rollout Agreement by failing to pay ecMarket all fees properly charged by ecMarket to Elemica for the pre-production and production services fees charged by ecMarket for active SpokeCo-Customer relationships in Elemica's network.

40. As a direct and proximate result of Elemica's breach of the Rollout Agreement, ecMarket has been damaged in an amount in excess of $130,000300,000.

### COUNTERCLAIM – COUNT II – REFORMATION

51.   ecMarket repeats and incorporates the allegations contained in paragraphs 1 through 52 of its Amended Counterclaims as if fully set forth herein.

52.   ecMarket and Elemica reached a definitive agreement as reflected in Elemica's acceptance of "Option 1" proposed by ecMarket. *See* Ex. B.

53.     The definitive agreement reached by the parties was to allow the *specific, identified* Dormant Maps, i.e., Inactive SpokeCos, set forth in Elemica's April 1, 2019 spreadsheet to remain in/on ecMarket's production network going forward but at a discounted fee beginning in April 2019. *Id.*

54.     However, the Seventh Addendum mistakenly failed to identify or reference the 1,219 *specific* Dormant Maps set forth in Elemica's spreadsheet.  Instead, through the mutual mistake of the parties, the Seventh Addendum referenced the number "1,300" instead of "1,219" (the actual number of Dormant Maps listed in Elemica's April 1, 2019 spreadsheet) and, in any and all events, failed to identify, reference or attach the specific Dormant Maps that would remain in/on ecMarket's production network per the parties' agreement.

55.     Still further, the parties' used the undefined term "CONEXIOM Fees" in the Seventh Addendum rather than use the proper term, which was "Production Service Fee," which represented the price charged to Elemica for each unique Spokeco to Customer relationship in ecMarket's production network during the given month.

56.     To the extent that the trier of fact determines that the agreement reached by the parties is consistent with ecMarket's allegations as contained herein, the Seventh Addendum should be reformed to correct the parties' mutual mistake and reflect the actual agreement reached between the parties, as reflected in Exhibit B.

57.     Alternatively, to the extent that the trier of fact determines that the agreement reached by the parties is consistent with ecMarket's allegations as contained herein and that Elemica knew that the Seventh Addendum did not accurately reflect that agreement but willfully

remained silent, the Seventh Addendum should be reformed to correct ecMarket's unilateral mistake and reflect the actual agreement reached between the parties, as reflected in Exhibit B.

58.     As reflected in Exhibit B, there was a specific meeting of the minds between ecMarket and Elemica regarding the Dormant Maps, i.e., Inactive SpokeCos, and how ecMarket would charge Elemica going forward with regard to those specific, clearly identified Dormant Maps.

59.     Accordingly, the Seventh Addendum should be reformed to reflect a formula consistent with the parties' agreement as follows:  Credit = P x F x 1,219 with the following clear definitions:

"P" references the percentage discount (25%, 50% or 75%) to be applied to the "Production Service Fee" charged to Elemica by ecMarket for the number of Trading Partners/Spokecos in/on ecMarket's production network during that month;

"F" references the Production Service Fee charged to Elemica by ecMarket for the number of Trading Partners/Maps in/on ecMarket's production network during that month; and

"1,219" references the 1,219 Dormant Maps, i.e., Inactive Spokecos, contained in Elemica's April 1, 2019 spreadsheet.[1]

60.     Still further, following the necessary reformation of the Seventh Addendum to conform to the parties' agreement, Elemica should be found to be in breach of the reformed Seventh Addendum and in breach of the Rollout Agreement for failing to pay all amounts properly due and owing to ecMarket.

**COUNTERCLAIM - COUNT III – BREACH OF**
**IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING**

---

[1] A copy of the Excel spreadsheet attached to Mr. Squillacioti's letter. Ex. A.

61.     ecMarket repeats and incorporates the allegations contained in paragraphs 1 through 62 of its Amended Counterclaims as if fully set forth herein.

62.     An implied duty of good faith and fair dealing is interwoven into every contract under Delaware law.

63.     The agreement reached by the parties in April 2019, as reflected in the Seventh Addendum, obligated Elemica not to remove or deactivate from ecMarket's production network the specific Dormant Maps/"Inactive SpokeCos" identified in Elemica's own April 1, 2019 spreadsheet.

64.     The Seventh Addendum did not specifically identify, reference or attach the list of Dormant Maps/"Inactive Spokecos" identified by Elemica in its April 1, 2019 spreadsheet. However, the parties clearly understood which Dormant Maps were the subject of the Seventh Addendum.

65.     Elemica breached its contractual obligations to ecMarket by affirmatively taking steps to deactivate/remove more than 1,100 of the Dormant Maps that the parties had agreed would remain in/or ecMarket's production network but at a discounted rate.

66.     Elemica's breach of its contractual obligations to ecMarket has resulted in damages to ecMarket in excess of $300,000 in the form of unpaid services provided by ecMarket to Elemica pursuant to the Rollout Agreement.

**COUNTERCLAIM - COUNT ~~III~~IV - DEFAMATION *PER SE***

67.     ~~41.~~ ecMarket repeats and incorporates the allegations contained in paragraphs 1 through ~~34~~68 of its ~~Counterclaim~~Amended Counterclaims as if fully set forth herein.

33

68.   42.  The Muse Email, including a copy of the Complaint which Mr. Muse attached to his email and incorporated therein by reference, contains multiple, defamatory statements and communications specifically directed against ecMarket.

69.   43.  Those statements and communications are false, and were published to numerous third parties, and repeatedly and specifically referred to ecMarket/Conexiom by name.

70.   44.  The third parties receiving the Muse Email and copy of the Complaint necessarily understood that the statements and communications contained therein were defamatory in character and specifically directed against ecMarket, which the third parties knew to be Conexiom.

71.   45.  The statements and communications contained in the Muse Email and in the attached Complaint malign ecMarket's reputation, business, trade and profession, and therefore such statements and communications constitute defamation *per se* under Delaware law.

72.   46.  By attaching a copy of its original Complaint to the Muse Email and incorporating it by reference to the recipients of the Muse Email, Elemica lost any ability it may have otherwise had to assert the litigation privilege to protect the defamatory statements contained in the Complaint.

73.   47.  As the statements and communications contained in the Muse Email (and the attached Complaint) constitute defamation *per se*, ecMarket need not plead nor prove special damages.

74.   48.  As a result of Elemica's tortious conduct, ecMarket is entitled to its compensatory damages, punitive damages and additional damages determined to be proper and awarded by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, ecMarket prays for judgment in its favor and against Elemica as follows:

A.     That the Court enter judgment against Elemica and in favor of ecMarket on the claims asserted in Elemica's Amended Complaint, and that the Amended Complaint be dismissed with prejudice;

B.     That the Court enter judgment against Elemica and in favor of ecMarket on Count I of ecMarket's Counterclaim for breach of the Rollout Agreement and award ecMarket its compensatory damages in an amount to be proven at trial;

C.     In the alternative, that the Court enter judgment against Elemica and in favor of ecMarket on Count II of ecMarket's Counterclaim, reform the Seventh Addendum so that it accurately reflects the agreement reached by the parties on April 9, 2019 as set forth in Exhibit B to this Amended Counterclaim, find Elemica in breach of the Rollout Agreement, as amended and reformed, and award ecMarket its compensatory damages in an amount to be proven at trial;

D.     That the Court enter judgment against Elemica and in favor of ecMarket on Count III of ecMarket's Counterclaim for breach of the implied covenant of good faith and fair dealing and award ecMarket its compensatory damages in an amount to be proven at trial;

E.     C. That the Court enter judgment against Elemica and in favor of ecMarket on Count IIIV of ecMarket's Counterclaim for defamation *per se*;

F.     D. That the Court award ecMarket compensatory damages, punitive damages and damages determined to be appropriate by this Court, including prejudgment and post-judgment interest;

35

G.   ~~E.~~ That the Court award ecMarket its costs in bringing this action and in defending this action, including the reasonable attorneys' fees it has incurred and will incur in prosecuting this action and defending against Elemica's claims; and

~~F.~~ That the Court grant and/or award to ecMarket any and all further relief that the Court deems just and proper.


Dated: ~~April 29, 2022~~ February, ___ 2024          **K&L GATES LLP**

/s/ ~~Steven L. Caponi~~_____
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
Megan E. O'Connor (No. 6569)
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com
megan.oconnor@klgates.com

*Of Counsel:*

**LANDSMAN SALDINGER
CARROLL, PLLC**
Richard A. Saldinger
Landsman Saldinger Carroll, PLLC
161 N. Clark, Ste. 1600
Chicago, IL 60601
Phone: (312) 291-4650
saldinger@lsclegal.com

*Counsel for Defendant/Counterplaintiff
ecMarket, Inc. d/b/a Conexiom, Inc.*

36

| Summary report: Litera Compare for Word 11.4.0.111 Document comparison done on 2/23/2024 3:58:22 PM | |
|---|---|
| **Style name:** KL Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://USEWRKDMS.IMANAGE.KLDOMAIN.COM/USE_Active01/312396147/1 | |
| **Modified DMS:** iw://USEWRKDMS.IMANAGE.KLDOMAIN.COM/USE_Active01/317908957/1 | |
| **Changes:** | |
| Add | 168 |
| Delete | 84 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 252 |