## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELEMICA, INC.,

     Plaintiff,

        v.

ECMARKET, INC. d/b/a
CONEXIOM INC.,

     Defendant.

C.A. No. 21-893-SB

**FILED UNDER SEAL**

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS
## <u>IN PLAINTIFF'S AMENDED AND SUPPLEMENTAL COMPLAINTS</u>

*Of Counsel:*

Richard A. Saldinger (ARDC No. 6209930)
LANDSMAN SALDINGER CARROLL, PLLC
161 N. Clark Street, Suite 1600
Chicago, IL  60601
Phone:  (312) 291-4652
saldinger@lsclegal.com

Steven L. Caponi (No. 3484)
Megan E. O'Connor (No. 6569)
K&L GATES LLP
600 N. King Street, Suite 901
Wilmington, DE  19801
Phone:  (302) 416-7000
steven.caponi@klgates.com
megan.oconnor@klgates.com

*Counsel for Defendant ecMarket, Inc.*

Dated:  April 10, 2024

## TABLE OF CONTENTS

**Page**

I.    Introduction .................................................................................................1

II.   Factual and Procedural Background .............................................................3

    A.    The Parties Enter Into The ERPLINK Rollout Agreement ....................................3

    B.    The February 20, 2014 Addendum to the Rollout Agreement ................................4

    C.    Salesforce Introduces DuPont To ecMarket ....................................................4

    D.    Elemica Acquires OmPrompt ...................................................................5

    E.    Elemica Falsely Accuses ecMarket Of Using Its Confidential Information............6

    F.    Elemica Files Its Complaint, Amended Complaint and Supplemental Complaint..................................................................................6

III.  Argument .....................................................................................................7

    A.    Legal Standard for Summary Judgment .................................................7

    B.    Elemica's Defend Trade Secret Act Claim Fails ......................................8

        1.    ecMarket did not use or disclose Elemica's "trade secrets" or "confidential" information to any prospective customers. ..................9

        2.    The Names of Customers Using Conexiom and QuickLink Are Not "Confidential" or "Trade Secrets." ...........................11

        3.    The Termination Date of the Rollout Agreement Was Not Confidential..................................................................13

        4.    Elemica Has Not Incurred Any Damages .................................14

    C.    Elemica Is Not Entitled to Injunctive Relief Pursuant To DUDTPA. ..............17

    D.    Elemica's Breach of Contract Claim Also Fails Because Elemica Cannot Demonstrate A "Compensable Injury." ...................................... 20

## TABLE OF CONTENTS

**Page(s)**

<u>**CASES**</u>

*Brightview Grp., LP v. Teeters*,
    2021 WL 1238501 (D. Md. Mar. 29, 2021)...........................................................................14

*Broker Genius, Inc. v. Zalta*,
    280 F. Supp. 3d 495 (S.D.N.Y. 2017)..................................................................................12

*Carbo Ceramics, Inc. v. Keefe*,
    166 F. App'x 714 (5th Cir. 2006)........................................................................................14

*Catalyst Advisors, L.P., v. Catalyst Advisors Invs. Glob. Inc.*,
    602 F. Supp. 3d 663 (S.D.N.Y. 2022)...................................................................................8

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..............................................................................................................7

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*,
    350 F.Supp.2d 582 (D. Del. 2004)......................................................................................20

*Daniels v. Sch. Dist. of Phila.*,
    776 F.3d 181 (3d Cir. 2015).................................................................................................8

*Del. Express Shuttle v. Older*,
    2002 Del. Ch. LEXIS 124....................................................................................................12

*Feenix Payment Sys., LLC v. Steel Cap. Mgmt., LLC*,
    2021 WL 2587844 (D. Del. June 24, 2021)...........................................................................8

*Johnson v. Gov't Employees Ins. Co.*,
    2014 WL 2708300 (D. Del. June 16, 2014)..........................................................................20

*Logansport Mach. Co., Inc. v. Neidlein-Spannzeuge GmbH*,
    2012 WL 1877854 (N.D. Ind. 2012)...................................................................................12

*Nat'l Risk Mgmt., Inc. v. Bramwell*,
    819 F. Supp. 417 (E.D. Pa. 1993) ......................................................................................12

*Oakwood Lab'ys LLC v. Thanoo*,
    999 F.3d 892 (3d Cir. 2021)..............................................................................................8, 9

*Peloton Interactive, Inc. v. iFIT Inc.*,
    2022 WL 1523112 (D. Del. May 13, 2022)........................................................................7, 8

*Petroleum v. Magellan Terminals Holdings, L.P.*,
  2015 WL 3885947 (Del. Super. June 23, 2015) ....................................................................20

*PrimeSource Bldg. Prods., Inc. v. Huttig Bldg. Prods., Inc.*,
  2017 WL 7795125 (N.D. Ill. 2017) ........................................................................................12

*REACT Envtl. Prof'l Servs. Grp., Inc. v. Buzan*,
  2021 WL 3604079 (E.D. Pa. Aug. 13, 2021) ........................................................................12

*Registered Agent Sols., Inc. v. Corp. Serv. Co.*,
  2022 WL 911253 (D. Del. Mar. 28, 2022) ............................................................................17

*Shareholder Representative Servs. LLC v. Medidata Sols., Inc.*,
  2020 WL 972618 (D. Del. Feb. 24, 2020) ............................................................................20

*Smash Franchise Partners, LLC v. Kanda Holdings, Inc.*,
  2023 WL 4560984 (Del. Ch. July 14, 2023) ...................................................................17, 18

**Statutes**

6 *Del. C.* § 2532 ........................................................................................................................17

18 U.S.C. § 1836 ........................................................................................................................14

18 U.S.C. § 1839 ....................................................................................................................8, 12

**Other Authorities**

Fed R. Civ. P. 56 ........................................................................................................................7

## I.    Introduction

In November 2009, Elemica, Inc. ("Elemica") and ecMarket, Inc. ("ecMarket") agreed that Elemica could "white label" and "resell" ecMarket's cloud-based software solution (known as "Conexiom") as Elemica's own solution under a different offering name. ecMarket and Elemica were (and still are) competitors targeting the same prospective customers in the chemical, oil and gas industries, but agreed that joining forces would be mutually beneficial. The parties decided ecMarket could publicize Elemica as a ███████████████████████████████ ████████████████████████████████ For the benefit of both parties' marketing interests, the nature of the parties' relationship and the identity of customers using Conexiom and "QuickLink" was public knowledge. Still further, at all relevant times, ecMarket was free to compete directly with Elemica for the same prospective customers, including customers receiving Conexiom through QuickLink. Indeed, ecMarket typically sells Conexiom directly to the end user rather than having its product "white-labelled" through a business partner.

In March 2021, ███████████████████████████████ Elemica announced that it was acquiring a company called OmPrompt, which would replace Conexiom. In a transparent attempt to inhibit competition following its acquisition of OmPrompt, Elemica initiated this lawsuit in June 2021 blindly alleging that ecMarket was misappropriating Elemica's alleged "trade secrets" in violation of the Defend Trade Secrets Act (Count I) and breaching the parties' Mutual Confidentiality Agreement (Count III) by using Elemica's "confidential" information to solicit prospective customers.

There was no evidence of wrongdoing when Elemica filed its original Complaint, and Elemica did not find evidence of wrongdoing during discovery, because ecMarket did nothing wrong. Elemica's    own    witnesses    impeached    Elemica's    prior    sworn    written

statements/declarations, and conceded the *only* allegedly confidential information used by ecMarket in any solicitation was: ██████████████████████████████ ████████ and ████████████████████████████████████ ██████████████████████████████████████████

These facts are not "trade secrets" nor are they false, misleading or confidential. In soliciting its own prospects, ecMarket did not use Elemica's proprietary information. Rather, ecMarket relied upon its own proprietary information, publicly available information and/or information Elemica agreed ecMarket could publicize.

Furthermore, Count I (violation of DTSA) and Count III (breach of contract) fail because Elemica cannot demonstrate that it suffered any damages.

Elemica's only other claim (Count II) is pursuant to Delaware's Uniform Deceptive Trade Practices Act ("DUDTPA"). Elemica alleges ecMarket violated DUDTPA by telling prospective customers ████████████████████████████████████████████ ██████████████████████████████████ However, Elemica's own witnesses acknowledged, *inter alia*, that these statements were true. Moreover, Elemica itself addressed any alleged "confusion" in early November 2021 through a defamatory email sent by Elemica's CEO to all Elemica customers receiving Conexiom. Thus, even if ecMarket made a false or misleading statement (which it did not), Elemica refuted those statements in November 2021. Because the alleged misconduct is not ongoing, injunctive relief is unavailable to Elemica, and the DUDTPA claim must fail.

At bottom, there is no genuine issue of material fact precluding summary judgment in ecMarket's favor on Counts I, II and III of Elemica's Amended and Supplemental Complaints.

## II.    Factual and Procedural Background

### A.  The Parties Enter Into The ERPLINK Rollout Agreement

In 2007, DuPont (an investor in Elemica) introduced ecMarket to Elemica believing there could be synergies between the parties. *See* Mark Toffoli (ecMarket) Dep., Ex.1, p.89, ll.8-20; Gary Neights (Elemica) Dep., Ex.2, p.25, ll.2-11. ecMarket wanted to expand its presence in the chemical industry by offering Conexiom directly to the customer or through a partner. *See* Toffoli (ecMarket), Ex.1, p.89, ll.8-23). ████████████████████

████████████████████████████████████

████████████████████████

In September 2007 – two years prior to entering into the Rollout Agreement - █████████

████████████████████████████ *See* Ex.4.

███████████████████████

███████████████████████████

████████████████████████

███████████████████████████

████████████████████ (emphasis added). Further, the parties agreed that ████████████████████████████

████████████████

On November 23, 2009, ████████████████████████████

███████████████████████ *See*  Ex.5. █████████



Elemica's Print-to-XML solutions

On December 18, 2009, ███████████████████████

█████████ *See* Ex.6. ████████████████████████

████████████████████████████ Further, ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

B.  The ████████████████████████████████████

On February 20, 2014, ████████████████████████████

███████████████████████████ *See* Ex.7. The parties agreed that "CONEXIOM" would be the new brand name for the "Services," and "QuickLink Print" and "QuickLink Email" would replace "Print-to-XML" as the brand names for the Elemica service. *Id.,* pp.1-2. Notably, the parties agreed (again) that ████████████████████████

████████████████████████████████████████ p.3. Elemica further agreed to ██████████████████████████████████████████

████████████████████████████████ never assisted ecMarket in publishing such a success story. *See* Toffoli (ecMarket), Ex.1, p.68, l.13 – p.69, l.25.

C.  Salesforce Introduces DuPont To ecMarket

In July 2020, a third party, Salesforce, introduced DuPont to ecMarket because DuPont was having processing issues with Elemica. *See* Ex.8 (July 9, 2020 email from Doug Porta

4

(Salesforce) to Ray Grady (ecMarket)); Ex.9 (affidavit of Jon Carrow on behalf of DuPont), ¶¶ 2-4); Deposition of Chris Chaudruc (Salesforce), Ex.10, p.13, ll.8-19, p.15, ll.1-24); Deposition of Hank Lish (ecMarket), Ex.11, p.15, ll.1-14, p.85, ll.9-21. ecMarket did not use or disclose Elemica's allegedly "Confidential Information" in its discussions with DuPont. *See* Lish (ecMarket), Ex.11, p.144, l.11-p.145, l.15. Rather, DuPont provided information ecMarket used to put its best foot forward during a thirteen (13) month sales effort which included a demonstration of Conexiom and ecMarket's formal written response to DuPont's "Request for Proposal." *See* Lish, Ex.11, p.43, l.17 – p.44, l.1; Ex.9 (DuPont Affidavit), ¶¶ 6, 8-9, Ex.12 (ecMarket response to DuPont RFP). In early September 2021, DuPont informed ecMarket that ecMarket would no longer be considered in connection with DuPont's then outstanding RFP. *See* Ex.13. As discussed *infra*, there is no evidence that ecMarket used Elemica's proprietary or confidential information during its efforts over the course of approximately thirteen (13) months (July 2020 – August 2021) to obtain DuPont's business.

D. Elemica Acquires OmPrompt

On March 8, 2021, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Elemica announced its acquisition of OmPrompt, a "UK-based technology company focused on helping businesses automate streamline and optimize supply chain processes and documentation management." *See* Ex.14; Brad Delizia (Elemica's general counsel) Dep., Ex.15, p.168, l.9 – p.170, l.4). Elemica's acquisition of OmPrompt confirmed that Elemica was not going to continue to partner with ecMarket and use Conexiom ▮▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* McAluney (Elemica), Ex.16, p. 140, l. 5 – p. 141, l.15.

E.   Elemica Falsely Accuses ecMarket Of Using Its Confidential Information.

In October 2020, Elemica accused ecMarket of improperly soliciting "Elemica's" customers. *See* Ex.17. ecMarket denied any wrongdoing. *See* Ex.18. In late April 2021, shortly after Elemica announced it acquired OmPrompt, ecMarket again accused ecMarket of soliciting prospective customers using Elemica's confidential information. *See* Ex.19. Although the parties did not have a non-compete, Elemica demanded that ecMarket agree not to "touch" an expansive list of eighteen (18) prospective ecMarket customers that were using Conexiom through Elemica's "QuickLink." *See* Ex.20.[1]  ecMarket refused to agree not to solicit is own prospective customers.

F.   Elemica Files Its Complaint, Amended Complaint and Supplemental Complaint.

When ecMarket refused Elemica's demand, Elemica filed a bare-bones Complaint alleging that ecMarket violated DTSA and breached the MCA. Dkt. 1. Based solely on "information and belief," Elemica asserted that ecMarket was using Elemica's allegedly confidential information to solicit prospective customers including BASF, DuPont and Lanxess. *See* Dkt. 1, ¶¶ 26, 27.

While ecMarket's Motion to Dismiss was pending, Elemica sought leave to file an Amended Complaint adding a DUDTPA claim and a claim for injurious falsehood. *See* Dkt. 18. The Court denied Elemica leave to add a claim for injurious falsehood and dismissed its breach of contract claim because Elemica did not allege any damages. *See* Dkt. 31.

 On June 14, 2023 – two years after initiating this lawsuit – Elemica sought leave to file a Supplemental Complaint reasserting its breach of contract claim. *See* Dkt. 62.  In support, Elemica submitted the sworn Declaration of Matthew McAluney (its Chief Commercial Officer). *See* Dkt. 63, Ex.22. In his Declaration, McAluney stated that as of November 2021, Elemica was not aware

---

[1] In a later email, Muse accurately referred to those customers using Conexiom through Elemica as "joint customers."  *See* Ex.21.

of any lost business. *Id.,* ¶¶ 4,5.  However, Elemica suddenly became aware of three "instances in which it []lost business or potential business as a result of [ecMarket's] contacts [with] Elemica's customers. *Id.,* ¶ 6. McAluney swore in his Declaration that:

> "As of November 2021, Elemica believed that DuPont's business would remain with Elemica without interruption, despite [ecMarket's] contacts.  Since then … DuPont demanded millions of dollars' worth of concessions from Elemica in a renegotiated contract … these concessions were demanded based on [ecMarket's] competing proposal and use of Elemica's confidential information." *Id.,* ¶ 8;

> "Elemica only recently learned that in response to [ecMarket's] inappropriate contacts with Honeywell and use of Elemica's confidential information, Honeywell has chosen to divert all new business to [ecMarket] and has frozen Elemica out of the process of potentially growing its business with Honeywell." *Id.*, ¶ 7;

> "Around June 2022, Elemica lost the business of its customer AmSty as a result of [ecMarket's] contacts with AmSty and use of Elemica's confidential information." *Id.,* ¶ 9.

In its verified response to ecMarket's First Set of Interrogatories, Elemica again stated unequivocally that it suffered damages because of ecMarket's use of Elemica's confidential information. *See* Ex. 23 (Response to Interrog. No. 6). As demonstrated *infra*, Elemica's sworn statements and Declaration did not have a good faith factual basis.

## III.   Argument

### A.  Legal Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED R. CIV. P. 56(a). The burden on the moving party may be discharged by demonstrating that there is an absence of evidence supporting the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial." *Peloton Interactive, Inc. v. iFIT Inc.*, 2022 WL 1523112, at *1 (D. Del. May 13, 2022). "The mere existence of a scintilla of evidence in support of the [nonmovant's]

position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (internal quotation omitted). "If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law." *Peloton*, 2022 WL 1523112 at *2.

### B. Elemica's Defend Trade Secret Act Claim Fails

To establish a Defend Trade Secrets Act ("DTSA") claim, Elemica must prove: "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce, and (3) the misappropriation of that trade secret[.]" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (internal quotations omitted). Summary judgment may be appropriate "where it is clear that the information at issue is not actually secret or there is no discernible economic value from that information not being generally known." *Catalyst Advisors, L.P., v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 672 (S.D.N.Y. 2022).[2]

"To qualify as a trade secret under the Defend Trade Secrets Act, the party seeking protection must have taken reasonable steps to ensure confidentiality of the alleged secret, the information must not be publicly available, and the alleged secret must derive independent economic value." *Feenix Payment Sys., LLC v. Steel Cap. Mgmt., LLC*, 2021 WL 2587844, at *3 (D. Del. June 24, 2021). Further, "the subject matter of the trade secret must be described 'with

---

[2] The DTSA defines "misappropriation" as: "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent" in certain circumstances. 18 U.S.C. § 1839(5).

sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies.'" *Oakwood*, 999 F.3d at 906.

      1.  ecMarket did not use or disclose Elemica's "trade secrets"
           or "confidential" information to any prospective customers.

In its interrogatory responses, Elemica (through its general counsel (Brad Delizia) and Matthew McAluney) stated that ecMarket solicited the following customers using Elemica's "confidential" information: Olin, DuPont, Honeywell, Dow, BASF, Americas Styrenics ("AmSty") and Wacker Chemie ("Wacker"). *See* Ex.23 (Resp. to Interrog. No. 1). Elemica verified that ecMarket used the following "confidential" information to solicit those customers:



However, in contrast to Elemica's sworn interrogatory responses, Elemica's own corporate representative, McAluney, testified:





During McAluney's deposition in his individual capacity, he testified, *inter alia*, that:



Ryan Borland (former Elemica account executive and current Elemica Vice-President of Global Client Success) testified:



Not a single document nor Elemica witness supported Elemica's sworn responses to Interrogatory Nos. 1, 2 and 4 with a single exception. Certain written solicitations sent by ecMarket

included the fact that the prospect was currently using Conexiom through Elemica's "QuickLink" solution. This fact, however, is neither confidential nor a trade secret.

### 2. The Names of Customers Using Conexiom and QuickLink Are Not "Confidential" or "Trade Secrets."

Evidence obtained through both discovery and the internet confirmed the identity of Elemica's customers, who are also ecMarket's prospective customers, are readily ascertainable and publicized by both Elemica and its own customers.

ecMarket independently develops and maintains a "Prospects List," which includes, among other prospects, an extensive list of prospective customers in the chemical, oil and gas industries. *See* Declaration of Mark Toffoli (ecMarket), Exs.26-27; Lish (ecMarket), Ex.11, p. 36, ll. 33, p. 142, l.9 – p. 143, l.7, p. 150, ll.4-18. All but one of the Elemica customers who were using the Conexiom solution through "QuickLink" were prospective customers of ecMarket. *Id.*; *see also* Ex.13 (Elemica Resp. to Interrog. No. 8.)

ecMarket's solicitations of its own prospects was proper, appropriate and did not improperly contain Elemica's "confidential" information. Group Exhibit 28 contains a series of emails sent in November 2021 or shortly thereafter by ecMarket account executives to ***its own*** prospective customers who were also customers of Elemica. The only allegedly "confidential" information contained in any ecMarket solicitation was: ████████████████████████ ████████████████████████ and ████████████████████████ ████████████████████████████████ ████████████████████ *Id.* However, those two facts were not and are not "confidential."

First, Elemica publicizes the names of its partners and its customers on its website and in press releases. *See* https://elemica.com/why-elemica/partner; *see also* Ex.29. Names of Elemica's

customers can also be found through an internet search including on the HG Insights website. *See* Ex. 30; *see also* https://discovery.hgdata.com/product/elemica. Although the phrase "reasonably ascertainable" is not defined in the DTSA, courts generally conclude that information obtained from public sources is readily ascertainable, particularly when that information is available on the Internet. *See* e.g., *Del. Express Shuttle v. Older*, 2002 Del. Ch. LEXIS 124, at *71-75 (holding that customer list is not a protectable trade secret where customers' identities could be ascertained from publicly available source); *PrimeSource Bldg. Prods., Inc. v. Huttig Bldg. Prods., Inc.*, 2017 WL 7795125, at *14 (N.D. Ill. 2017) (finding that plaintiff's supplier list and contact information were not trade secrets where the information was publicly available through Internet resources).

Trade secret status under DTSA requires a trade secret owner to take reasonable measures to keep such information secret. 18 U.S.C. § 1839(3)(A). Intending to keep customer information secret is not enough, rather business owners must take active steps to maintain the secrecy of the list and to ensure continuous protection. *See e.g., Logansport Mach. Co., Inc. v. Neidlein-Spannzeuge GmbH*, 2012 WL 1877854, at *11 (N.D. Ind. 2012). "It is axiomatic that a plaintiff cannot recover for the misappropriation of a trade secret if he revealed that secret" to the world. *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 518 (S.D.N.Y. 2017); *see also REACT Envtl. Prof'l Servs. Grp., Inc. v. Buzan*, 2021 WL 3604079, at *13 (E.D. Pa. Aug. 13, 2021) (plaintiff did not maintain the secrecy of the proposal by providing it to the client who was under no restrictions against its use and were free to use the proposal however he chose); *Nat'l Risk Mgmt., Inc. v. Bramwell*, 819 F. Supp. 417, 432 (E.D. Pa. 1993) (holding that "information ... freely given out to prospective clients" is not a trade secret).

Here, Elemica failed to take "reasonable measures" to maintain the confidentiality of the identities of its customers. Instead, it took affirmative steps to ensure that ecMarket, Elemica and

customers could publicize such information. Indeed, Elemica's form Master Agreement with its customers permits Elemica to publicize on its website and otherwise its relationship with its customers, including the "Services" Elemica provides to its customers. *See* Ex.31, at p.6. Elemica's customers are also free to (and do) publicize that they use Elemica's solutions, including "QuickLink." *See* Ex. 32. During the term of the Rollout Agreement, Elemica itself disclosed to its customers that they were using Conexiom through QuickLink. *See* Exs. 33-35

Moreover, Elemica agreed from the outset that ecMarket could publicize the nature of its relationship with Elemica and the services that would be offered to the customers. *See* Ex. 3, ¶¶ 9,10; Ex. 6 ("Publicity"); Ex. 7, p.3 ("Publicity). ███████████████████████████████

████████████████████████████████████████████████████

███████████████████ Elemica's agreement to allow ecMarket to publicize this information belies its current position that such information was a confidential "trade secret."

Elemica does not attempt to keep such information "confidential" because the identity of its customers is not proprietary information and Elemica's ability to publicize the names of its customers is good for business. Moreover, the list of prospective customers in the chemical, oil and gas industries is well known to both Elemica and ecMarket. As evidenced by ecMarket's independently developed "Prospects List," ecMarket and Elemica target the same group of prospective customers. *See* Exs. 26, 27.

### 3. The Termination Date of the Rollout Agreement Was Not Confidential.

There is also nothing "confidential" or "proprietary" about ███████████████████

██████████████████████████████████ In March 2021, Elemica publicly announced its acquisition of OmPrompt to replace Conexiom. *See* Ex.14. Shortly thereafter, Elemica was disclosing to its customers (including DuPont and Dow) that OmPrompt would be

replacing Conexiom. *See* Exs. 36, 37.  Still further, in early November 2021, Elemica disclosed to **all** its customers using Conexiom that it had acquired OmPrompt to "replace the existing Conexiom service with an improved and enhanced service." *See* Ex. 35. Elemica cannot seek the protections afforded by DTSA while it readily discloses its alleged "confidential" information to others without any restraint or restrictions. Moreover, Elemica has failed to demonstrate how or why the customer's use of Conexiom and the end date of the parties' contract has any "independent economic value" to Elemica. If that was Elemica's actual belief, it would not have agreed to allow ecMarket to publicize the nature of the parties' relationship.

4.  <u>Elemica Has Not Incurred Any Damages.</u>

Under the DTSA, monetary damages may include (1) damages for "actual loss caused by misappropriation," and (2) "unjust enrichment caused by misappropriation," or (3) "a reasonable royalty for the misappropriator's unauthorized disclosure or use." 18 U.S.C. § 1836(b)(3)(B). A damages theory that is overly speculative will not warrant monetary relief. *See Brightview Grp., LP v. Teeters*, 2021 WL 1238501, at *16 (D. Md. Mar. 29, 2021); *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 723–25 (5th Cir. 2006) ("Because Carbo has failed to meet its burden of presenting sufficient evidence demonstrating a triable issue of material fact as to actual damages recoverable under its trade secret misappropriation claim, we affirm the district court's grant of summary judgment as to that claim.")

In the McAluney Declaration and in its verified response to ecMarket's Interrogatories, Elemica identified three instances in which "ecMarket's improper use of Elemica's 'Confidential Information' and trade secrets [] caused harm: DuPont, Honeywell and AmSty. *See* Ex.23 (Elemica response to Interrog. No. 6), Ex.22. Fact discovery, however, did not support Elemica's damage claims.

<u>DuPont</u>

In the McAluney Declaration (Ex.22) and in its interrogatory responses, Elemica unequivocally states that as a result of ecMarket's use of Elemica's confidential information, it was "forced" to renegotiate its contract with DuPont and provide "2,100 onboardings at no charge," causing a loss of approximately $2,000,000 or more. *See* Ex.23 (Resp. to Interrog. Nos. 1, 2 and 6). This sworn claim, however, is indisputably false.

In both his Declaration and at his deposition, McAluney relied solely on a November 3, 2021 email to support Elemica's damages claim. *See* Ex.22; McAluney, Ex.24, p.72, l.16 – p.73, l.13. Elemica, however, offered the alleged "concessions" in its ***July 2021*** response to DuPont's RFP. *See* Ex. 36, p.21; McAluney, Ex.24, p.95, l.19 – p.96, l.21. Moreover, Elemica and DuPont (after further negotiations throughout July, August and September) entered into their new agreement on September 29, 2021. *See* Exs. 37, 38. It is axiomatic that ecMarket's November 2021 email solicitation to DuPont could not "force" Elemica to make concessions back in July 2021.

The deposition testimony of Elemica witnesses failed to support Elemica's alleged damages. Elemica's corporate representative, McAluney testified that:



In his individual capacity, McAluney testified, *inter alia*, that:



At bottom, it was DuPont who approached ecMarket, and ecMarket had every right to respond to DuPont's inquiry when attempting to sell its Conexiom solution directly to DuPont. DuPont, in turn, had every right to issue an RFP and accept proposals from multiple vendors including both Elemica and ecMarket. DuPont could and did negotiate with both Conexiom and Elemica regarding the scope, services and pricing of each respective party's proposal. Elemica was not "forced" to make any concessions to DuPont as result of ecMarket's or any other contenders' efforts to obtain DuPont's business.

<u>Honeywell</u>

Honeywell became an ***ecMarket*** customer in 2018 after receiving an inbound inquiry from Honeywell in 2017. *See* Schumann (ecMarket), Ex.39, p.14, ll.10-23. Elemica has not lost any Honeywell business because of any improper conduct by ecMarket. Elemica's corporate representative (McAluney) testified:





AmSty

Elemica's witnesses also did not support the claim that it had lost AmSty business because of ecMarket's alleged solicitation using Elemica's confidential information. *See* McAluney (Elemica), Ex.16, p. 127, l. 21 – p. 131, l. 8. When put to its proof, Elemica had no evidence of ecMarket using any of Elemica's "confidential" information to solicit AmSty. *Id.* Shortly after Mr. McAluney's testimony impeached his own Declaration, Elemica withdrew its claim for damages related to AmSty. *See* Ex.40.

Elemica cannot demonstrates with any certainty, much less reasonable certainty, that it has suffered any damages. For this reason alone, Elemica's DTSA claim fails.

C. Elemica Is Not Entitled to Injunctive Relief Pursuant To DUDTPA.

The Delaware Uniform Deceptive Trade Practices Act ("DUDTPA") bans "disparage[ing] the goods, services, or business of another by false or misleading representation[s] of fact." 6 *Del. C.* § 2532(a)(8). "But the Act redresses ongoing practices, not past wrongs. So relief under the statute is dependent on [the plaintiff's] entitlement to injunctive relief." *Registered Agent Sols., Inc. v. Corp. Serv. Co.*, 2022 WL 911253, at *15 (D. Del. Mar. 28, 2022). "To show that entitlement, [plaintiff] must plead facts that create a reasonable apprehension of a future wrong." *Id.* (internal quotation omitted). In *Registered Agent*, the Delaware District Court dismissed the DUDTPA claim because the plaintiff could not demonstrate a "reasonable apprehension" that the alleged improper marketing campaign was ongoing. *Id.* A party can prove a violation of the DUDTPA if it can prove that a statement made about its business is false. *See Smash Franchise*

*Partners, LLC v. Kanda Holdings, Inc.*, 2023 WL 4560984, at *72-75 (Del. Ch. July 14, 2023). However, the defendant can demonstrate that the false statement was made with a good faith belief that it was true, and thus permanent injunctive relief would be inappropriate. *Id.* at *77-78. Moreover, a plaintiff's failure to demonstrate a reasonable apprehension of future misconduct is fatal to any request for injunctive relief. *Id.* at *77. Importantly, DUDTPA does not provide an independent cause of action for damages. *Id.* at *80-81.

Elemica's DUDTPA claim relies on two allegedly "false" and "misleading" statements contained in the "Olin Email" and the "DuPont Email." *See* Dkt. 33, ¶¶ 29-36, Exs. B,C. The statements in the Olin Email and DuPont Email were neither false nor misleading.

Statement One: "Quick Link is actually white-labeled Conexiom." *See* Ex.41. This statement is accurate. In the LOI (Ex.3), Elemica agreed and acknowledged that "to facilitate the [relationship between ecMarket and Elemica], ecMarket intends to grant Elemica the right to use and market ERP Link [n/k/a Conexiom] and sub-license the Applications as a *'white-labelled'* service so that all references to ecMarket are replaced with Elemica." *See* Ex.3 at "Nature of Relationship" (emphasis added). Ryan Borland (Elemica's Vice President of Global Client Success) testified twice during discovery – once in his individual capacity and once as a corporate representative of Elemica. On both occasions, ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ When Elemica's own corporate representatives ██████████████████ ██████████████████████ Elemica cannot readily argue that ecMarket's use of that term was either false or misleading.

Statement Two: "DuPont is using Conexiom through Elemica to automate sales orders.  I was recently informed that our partnership with Elemica is ending as of March 2022 and this service will no longer be available for your organization." *See* Ex. 43. This statement is also accurate.  The relationship between Elemica and ecMarket was ending as of March 1, 2022, and the customer would no longer be able to receive the benefits of ***Conexiom*** through Elemica.  *See* Lish, Ex.11, p. 40, ll. 10-19.

In any event, Elemica's then CEO (David Muse) addressed any alleged misunderstanding and confusion by sending his defamatory email (the "Muse Email") on November 9, 2021 to more than 150 individuals affiliated with 30 customers using the "Elemica solution powered by Conexiom." *See* Ex.35 (Muse Email), Ex.44 (2nd Amended Response to Interrog No. 8). Muse attached Elemica's Complaint to his email and accused ecMarket of making "false" and "misleading" claims and acting "unethically" and "inappropriately." *See* Ex.35.  In his email, Muse told ***all*** the customers receiving Conexiom through QuickLink that:

> "It has come to our attention that a few of you have received communications from Elemica's service provider, Conexiom, regarding potential interruption of Elemica's QuickLink service.  We want to assure you that Elemica's service will continue without interruption."

> "We want to clear up the false claim that Elemica's QuickLink solution is a "white labeled Conexiom product …."

> "Elemica recently acquired a leading technology provider in this space, OmPrompt (transaction closed in March of this year).  The technology that we acquired is a foundational component of our next generation that ***will replace the existing Conexiom service*** with an approved and enhanced service for all of your transactions with the Elemica Sell suite." *Id.*

The alleged false and misleading statements occurred approximately 2.5 years ago, and there is no evidence that the alleged misconduct is ongoing.  Moreover, and in any event, Elemica

addressed the alleged "false" and "misleading" statements in the defamatory Muse Email.  For all the foregoing reasons, Elemica is not entitled to injunctive relief, and its DUDTPA claim fails.

### D.  Elemica's Breach of Contract Claim Also Fails Because Elemica Cannot Demonstrate A "Compensable Injury."

Under Delaware law, a plaintiff establishes a claim for breach of contract by demonstrating "(1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) resultant damages to the plaintiff." S*hareholder Representative Servs. LLC v. Medidata Sols., Inc.*, 2020 WL 972618, at *2 (D. Del. Feb. 24, 2020).  Delaware law has established that "[i]t is axiomatic that a plaintiff, in order to recover damages from a defendant for breach of contract, must demonstrate with reasonable certainty that [the] defendant's breach caused the loss." *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F.Supp.2d 582, 596-7 (D. Del. 2004) (internal quotation omitted).  "Speculative damages are not recoverable." *Id.* (internal citations omitted.). "When the factual record reveals that plaintiff has suffered no damages as a result of an alleged breach of contract, summary judgment is appropriate." *Petroleum v. Magellan Terminals Holdings, L.P.*, 2015 WL 3885947, at *12 (Del. Super. June 23, 2015).  To establish a fact dispute damages, they must "be actual and cannot be 'merely speculative or conjectural.'"  *Id.* (internal quotation omitted); *see also Johnson v. Gov't Employees Ins. Co.*, 2014 WL 2708300, at *1 (D. Del. June 16, 2014) (holding plaintiff must prove "breach of the contract was the proximate cause of damages").

This Court previously dismissed Elemica's breach of contract claim because Elemica did not allege a "compensable injury." *See* Dkt.31 at 6-7.  Despite its sworn interrogatory responses and the McAluney Declaration, Elemica still cannot demonstrate that it suffered any damages as a proximate result of ecMarket's alleged misconduct.  *See* III.B.4 *supra.* There is no genuine issue of material fact that Elemica's breach of contract claim (Count III) fails as a matter of law.

20

Dated:  April 10, 2024

**K&L GATES LLP**

*/s/ Steven L. Caponi*

Steven L. Caponi (No. 3484)
Megan E. O'Connor (No. 6569)
600 N. King Street, Suite 901
Wilmington, DE  19801
Phone:  (302) 416-7000
steven.caponi@klgates.com
megan.oconnor@klgates.com

*Of Counsel*:

Richard A. Saldinger
LANDSMAN SALDINGER
    CARROLL, PLLC
161 N. Clark Street, Suite 1600
Chicago, IL  60601
Phone:  (312) 667-1359
saldinger@lsclegal.com

*Counsel for Defendant ecMarket, Inc.*