## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ELEMICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> ECMARKET, INC. d/b/a CONEXIOM INC., <br><br> Defendant. | C.A. No. 21-893-SB |

### DEFENDANT/COUNTER-PLAINTIFF ECMARKET, INC.'S RESPONSE IN OPPOSITION TO ELEMICA, INC.'S MOTION FOR SUMMARY JUDGMENT ON BREACH OF CONTRACT AND DEFAMATION

**K&L GATES LLP**
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
Megan E. O'Connor (No. 6569)
600 N. King Street, Suite 901
Wilmington, DE  19801
Phone:  (302) 416-7082
steven.caponi@klgates.com
matthew.goeller@klgates.com

*Counsel for Defendant*

*Of Counsel:*

Richard A. Saldinger (ARDC No. 6209930)
Landsman Saldinger Carroll, PLLC
161 N. Clark Street, Suite 1600
Chicago, IL  60601
Phone:  (312) 291-4652
saldinger@lsclegal.com

*Admitted Pro Hac Vice*

Dated: April 29, 2024

# TABLE OF CONTENTS

**Page**

I.      Introduction .................................................................................................................1

II.     ecMarket's Supplemental Statement of Facts .............................................................2

     A.      ecMarket Agrees To Provide A Discount to
            Elemica For Approximately 1,300 Specific Dormant Maps ...................................2

     B.      Elemica Fails To Pay All Amounts Due To ecMarket ...........................................6

     C.      Elemica Deactivates The Majority Of Specific
            Maps Prior To The Expiration of the Rollout Agreement ......................................7

     D.      ecMarket Removed Certain Elemica Data For
            Security Purposes in the Ordinary Course of Its Business .....................................8

     E.      The Muse Email Is Sent To All Elemica Customers Using Conexiom ...................9

III.    Argument .....................................................................................................................9

     A.      ecMarket Need Not Prove Special Damages Or Reputational Harm .....................9

     B.      Elemica Agreed Not To Deactivate The Specific Maps .....................................153

     C.      Conexiom Did Not Waive Elemica's Contractual Obligation
            Not to Deactivate the Specific Maps in the Production Environment .............. 15.

     D.      There Was No Spoliation Of "Critical Evidence" By ecMarket .........................17

     E.      Elemica Breached The Parties' Agreement ........................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*,
   871 A.2d 428 (Del. 2005) .......................................................................17

*Bantum v. New Castle County Vo-Tech, Educ. Ass'n,*
   21 A.3d 44 (Del. 2011) ...........................................................................16

*Bull v. United Parcel Serv., Inc.*,
   665 F.3d 68 (3d Cir. 2012).......................................................................18

*Del. Express Shuttle v. Older*,
   2002 Del. Ch. LEXIS 124 (Del. Ch. Oct. 23, 2002) ..............................11

*Gannett Co. v. Kanaga*,
   750 A.2d 1174 (Del. 1998) .....................................................................11

*George v. Frank A. Robino, Inc.*,
   334 A.2d 223 (Del. 1975) .......................................................................17

*James v. United Med. LLC,*
   2017 Del. Super. LEXIS 161 (Del. Super. Mar. 31, 2017).....................14

*Kanaga v. Gannett Co.*,
   687 A.2d 173 (Del. 1996) .......................................................................11

*McKinney Family L.P. v. Stubbs*,
   2007 Del. LEXIS 291 (Del. July 2, 2007) .......................................14, 15

*Preston Hollow Capital LLC v. Nuveen LLC*,
   2022 Del. Super. LEXIS 264 (Del. Super. June 14, 2022) ..................9, 12

*Prof'l Investigating & Consulting Agency, Inc. v. Hewlett-Packard Co.*,
   2014 Del. Super LEXIS 458 (Del. Super. September 3, 2014) .........11, 12

*Q-Tone Broadcasting, Co. v. Musicradio*,
   1994 Del. Super. LEXIS 453 (Del. Super. Aug. 22, 1994) .....................12

*Rice v. Simmons,*
   2 Harr. 417 (Del. 1836)...........................................................................10

*SodexoMAGIC, LLC v. Drexel Univ.*,
   24 F.4th 183 (3rd Cir. 2022) ...................................................................14

*Spence v. Funk*,
    396 A.2d 967 (Del. 1978) ................................................................................10, 12

*Taylor v. Jones*,
    2002 Del. Ch. LEXIS 152 (Del. Ch. Dec. 17, 2002) .............................................14

**Other Authorities**

Federal Rule of Civil Procedure 37(e)(2) .......................................................................18

## I.     Introduction

Elemica seeks to avoid a trial on ecMarket's claims so the jury does not consider Elemica's defamatory statements and breach of the parties' agreement. The Motion, however, lacks legal and factual support, and genuine issues of material fact remain precluding summary judgment.

Elemica does not dispute the defamatory statements in the "Muse Email" malign ecMarket's reputation, business, trade and profession, and constitute defamation *per se* under Delaware law.  Elemica also does not argue that its defamatory statements were true. Rather, Elemica seeks summary judgment based on ecMarket's alleged inability to prove reputational harm. However, under Delaware law, ecMarket need not prove reputational harm for the jury to award ecMarket nominal, compensatory and/or punitive damages. Further, at trial, ecMarket can and will demonstrate that Elemica's defamatory statements were made with reckless disregard for the truth, which provides the jury with an additional legal basis to award damages.  In any event, Elemica is not entitled to summary judgment on ecMarket's claim for defamation *per se.*

Elemica also argues that summary judgment is appropriate on ecMarket's breach of contract claim because Amendment #6 is unambiguous and Elemica had the unfettered right to deactivate any "SpokeCos" or "trading partners" and still receive a discount on the fees charged by ecMarket. However, Elemica's own witnesses have admitted Amendment # 6 does ***not*** reflect the complete agreement reached by the parties. Elemica breached the parties' complete agreement by deactivating most of the trading partners they agreed to keep in ecMarket's Production Environment.  Elemica's heavy reliance solely on the language in Amendment #6 is misplaced, as Amendment #6 is not a fully integrated contract. As such, this Court can consider extrinsic evidence that supplements the terms in Amendment #6. Elemica's efforts through litigation to change a deal that its own witnesses admit never changed should not be condoned.

Elemica's waiver and spoliation arguments fare no better. At a minimum, there is a disputed question of fact as to whether ecMarket *intentionally* waived Elemica's contractual obligation not to deactivate the "Specific Maps" (as defined *infra*). Elemica cannot credibly claim there was spoliation when it received the business records evidencing Elemica's deactivation of the Specific Maps. Elemica could attempt to refute such documents with its own business records and/or witness testimony, but has been unable to do so. At bottom, the deletion of certain data contained within ecMarket's client database was neither intentional nor prejudicial to Elemica.

## II.   ecMarket's Supplemental Statement of Facts

Elemica's "Concise Statements Of Facts," fails to provide a full and complete summary of the relevant facts obtained through discovery. Most notably, as set forth *infra,* Elemica ignores the testimony of its own witnesses admitting "Amendment #6" to the Rollout Agreement does *not* reflect the parties' full agreement. ecMarket provides the following supplemental statement to provide a full and complete picture of the facts relevant to the disposition of Elemica's Motion.

### A.   ecMarket Agrees To Provide A Discount to Elemica For Approximately 1,300 *Specific* Dormant Maps.

Within the Rollout Agreement, the customers of Elemica's customers were referred to as "trading partners" or "Spokecos." *See* Mot., Ex. C, p.1 ("Purpose"). A "Map" was a specific template that defined how to convert a Spokeco purchase order from ecMarket's proprietary XML format into Elemica's Flat File format. *See* Ex. 1 (February 20, 2014 Addendum to Rollout Agreement), p.2. ecMarket charged Elemica a monthly "production service fee" for each "Spokeco" in production (known as ecMarket's "Production Environment"). *Id.* ecMarket also charged Elemica a separate, one-time "Pre-Production Service Fee" for each new Map ecMarket created for a new Spokeco during a given month. *Id.* at 2-3. From time to time, Maps created for certain Spokecos would become "dormant" meaning that the Spokeco was no longer submitting

2

purchase orders. *See* Ex. 2 (Dep. of Vince Squillaciotti (Elemica)), p.39, ll.7-17, p.44, ll.4-12. Although Elemica was paying for dormant Maps in the Production Environment, ecMarket was not automating any purchase orders for those Spokecos. *Id.*

On April 1, 2019, Elemica emailed ecMarket's then CEO, Brent Halverson, requesting that "the Maps set forth in the attached excel spreadsheet be moved out of the Production environment effective immediately." *See* Ex. 3. The "re" line referred to "1300 Dormant Maps," and the attached spreadsheet identified the ***specific*** Maps to be removed from ecMarket's Production Environment (the "Specific Maps"). *Id.*[1] Mr. Squillacioti explained "[t]he Maps are not used by our customers and thus should not be in the Production environment … and thus pursuant to our ERP Rollout Agreement, should not be charged going forward." *Id.* If "dormant" Maps were removed from the Production Environment, the fees paid by Elemica would necessarily go down. *See* Ex. 4 (Dep. of Anthony Palladino (Elemica), p.21, ll.9-18, p.44, l.23 – p. 45, l.5.

In response, ecMarket presented Elemica with two options. *See* Ex. 5 at ECM 014. Option 1 would keep the Specific Maps in ecMarket's Production Environment, but charge Elemica a discounted monthly fee for those Specific Maps going forward. *Id.* Under "Option 2," ecMarket would charge Elemica a one-time fee of $65,000 to remove the Specific Maps from the Production Environment, but Elemica would incur a "new mapping fee" (i.e., a Pre-Production Service Fee) for ecMarket to create a new "Map" if the SpokeCo chose in the future to automate sales orders again. *Id.; see also* Ex. 2 (Squillaciotti), p. 90, ll.7-24. Via Vince Squillaciotti's April 9, 2019 email, Elemica agreed to Option 1, which would keep the Specific Maps in the Production Environment, but at reduced fees. *See* Ex.5 at ECM 014.

---

[1] The spreadsheet attached to Mr. Squillaciotti's email specifically identified 1219, rather than 1,300, Maps.  The Maps identified in Mr. Squillacioti's spreadsheet will be referred to as the "Specific Maps."

Elemica disputes the discount it received applied to any specific set of "trading partners." *See* Mot. at 4. However, Elemica's witnesses conceded Elemica agreed to "Option 1," which applied to a specific list of trading partners, i.e., the Specific Maps, and that the agreement reached via email between the parties never changed after April 9, 2019. More specifically, Mr. Squillacioti testified that he wanted the "Specific Maps" removed from the Production Environment, and confirmed the agreement reached was for a discount to be applied to those "Specific Maps" referenced on the spreadsheet he sent to ecMarket. *See* Ex. 2, p.73, ll.10-15, p. 77, l.16 – p.78, l.3, p. 80, l.7 – p.81, l.16, p. 96, l.11 – p. 97, l.5.  Mr. Squillacioti testified that he has no knowledge of the agreement changing prior to August 2020 (when Elemica terminated his employment). *Id.,* p.23, l.16 – p. 24, l.1, p.99, ll.16-24, p.102, l.24 – p.103, l.10.

Anthony Palladino was Elemica's Chief Financial Officer during the relevant time period. *See* Ex. 4, p.11, l.3 – p. 12, l.7. Although copied on the relevant emails, Mr. Palladino testified he was not aware of Elemica's request for the removal of the Specific Maps and did not recall having any discussions with anyone at Elemica regarding that request during the relevant time frame. *Id.*, p.22, ll.2-7, p. 24, l.23 – p. 25, l.6. Although he had no involvement in the preparation of Amendment #6, Mr. Palladino conceded that the reference to "1,300" in that document was a reference to a specific list of dormant maps. *Id.*, p.24, ll.10-15, p.32, l.5 – p. 33, l.10. Mr. Palladino did not perform any investigation to determine whether the Specific Maps were subsequently deactivated and removed from ecMarket's Production Environment.  *Id.*, p.34, l.15 – p.35, l.9.

On July 17, 2019, ecMarket's then CEO (Brent Halverson) sent Elemica's in-house counsel (Brad Delizia) a proposed addendum to the Rollout Agreement. *See* Ex. 6. Notably, Halverson's email to Delizia included the email chain whereby Elemica originally requested the removal of the Specific Maps and agreed to "Option 1." *Id.* The proposed amendment provided Elemica with a

discount pursuant to a formula: "Credit = P x F x 1,300." *Id.* Upon receiving the draft addendum and the email chain that accompanied it, Elemica's in-house counsel, Brad Delizia, referenced the Specific Maps and stated: "Just want to confirm that **the** 1300 Dorman[t] Maps is [sic] counted as in Production when we go to the table in Exhibit 1(a) - # of unique Spokeco to Customer relationships in Production." *Id.* (emphasis added). Halverson confirmed that Delizia's understanding was correct. *Id.* The parties signed Amendment #6, but the amendment did not indicate that it was a fully integrated contract. *See* Mot. at Ex. D.

When deposed, Mr. Delizia (Elemica's Rule 30(b)(6) witness on this issue) attempted to evade answering direct questions regarding the parties' agreement. *See* Ex. 7 (Dep. of Brad Delizia), p. 111, l. 12 – p. 112, 1.14, p.124, l.3 – p.130, l.8. Ultimately, Mr. Delizia, who was copied on all relevant emails, conceded:

- He was not involved in Elemica's request to deactivate the Specific Maps. *Id.,* p.114, ll.3-15;

- Elemica's April 1, 2019 request was regarding specific dormant maps that remained in ecMarket's Production Environment. *Id.,* p.116, l.12 – p. 117, l.17;

- Elemica agreed to Option 1 in Mr. Toffoli's email. *Id.,* p.120, l.24 – p.121, l.14;

- He never spoke with Brent Halverson regarding the proposed addendum. *Id.,* p.122, l.22 – p.123, l.3;

- He had no knowledge of the deal changing after the parties reached an agreement via email on April 9, 2019. *Id.*, p.132, l.6 – p. 133, l.20;

- He made no revisions to the proposed addendum, but only asked a clarifying question. *Id.*, p. 133, l.22 – p.134, l.3;

- Despite being copied on the email chain between Mr. Squillacioti and Mr. Toffoli, Delizia testified that the reference to the "1,300" in Amendment #6 was **not** a reference to the Specific Maps, but just a "constant." *Id.*, p.138, l.14 – p.141, l.10;

- He was not aware of and not a part of any conversations with ecMarket when the parties discussed any type of discount other than the discount ecMarket agreed to provide through "Option 1." *Id.*, p.142, l.11 – p.143,1.14; and

- He does not know whether the Specific Maps remained in the Production Environment or were deactivated by Elemica. *Id.,* p.148, l.24 – p.149, l.8.

It is ecMarket's position that "P" stood for the % discount (25%, 50% or 75%), while F stood for the monthly Production Service Fee charged by ecMarket for SpokeCos in the Production environment. *See* Ex. 8 (Dep. of Mark Toffoli (ecMarket)), p.77, l.16 – p.78, l.9. 1,300, however, was not a "constant" unrelated to the Specific Maps. Rather, it was a reference to the Specific Maps which would stay in the Production Environment per the parties' agreement reached via email on April 9, 2019. *Id.*, p.75, l.6 – p.77, l.5.

B.    Elemica Fails To Pay All Amounts Due To ecMarket

In October 2021, a disagreement arose between the parties regarding the application of the discount, the deactivation of the Specific Maps and the amounts due from Elemica for outstanding invoices issued by ecMarket. *See* Exs 9-11. It was not until the fall of 2021 that ecMarket's accounting department learned that Elemica had deactivated most of the Specific Maps. *See* Ex.10. During these email communications, Elemica took the position *for the first time* that it was entitled to a flat discount per Amendment #6 without regard to whether the Specific Maps had been deactivated and removed from the Production Environment. *See* Exs. 10-11. ecMarket disagreed with Elemica's position and provided Elemica with a copy of the email correspondence reflecting the agreement reached by the parties on April 9, 2019.  *See* Ex. 10.

During discovery, ecMarket proffered a Rule 30(b)(6) witness (Monika Brar) who prepared a detailed spreadsheet and testified regarding the outstanding amounts owed by Elemica and the method by which ecMarket calculated the amounts due and owing. *See* Ex. 12 (Dep. of Monika Brar), p. 18, l.5 – p.19, l.13; Ex. 13. ecMarket produced the invoices supporting Ms. Brar's

calculation of Elemica's damages and her testimony that Elemica owes ecMarket $318,926.67. *See* Ex. 12, p.11, l.22 – p.13, l.2; Ex. 13; Ex. 14. Elemica does not challenge Ms. Brar's conclusion.

Still further, even if Elemica's disputed view of the parties' agreement is correct (which it is not), there is **still** an outstanding balance of $20,330.10 owed by Elemica to ecMarket. *See* Ex. 15 (Affidavit of Monika Brar), at ¶¶ 5-10; *see also* Ex. 16.

> C.    Elemica Deactivates The Majority Of Specific
>        Maps Prior To The Expiration Of The Rollout Agreement

During fact discovery, John Cadigan testified as ecMarket's Rule 30(b)(6) witness regarding the deactivation of the Specific Maps. Mr. Cadigan testified at length regarding the spreadsheet (*see* Ex. 17) he put together through his review and analysis of ecMarket's business records. *See* Ex. 18 (Dep. of John Cadigan – Vol. I), p.28, l.9 – p.32, l.20. Mr. Cadigan explained how the spreadsheet reflects which Specific Maps were deactivated and when they were deactivated. *Id.* Still further, Mr. Cadigan explained the source documents from which he created his spreadsheet. *See* Ex. 19 (Dep. of John Cadigan – Vol. II), p.4, l.15 – p.5, l.23. Thereafter, ecMarket produced copies of all the invoices and source documents supporting Mr. Cadigan's spreadsheet and the amounts due ecMarket for the unpaid invoices. *See* Ex. 20.

In its Motion, Elemica fails to disclose Mr. Cadigan's testimony, his spreadsheet or the existence and production of these source documents. Elemica also fails to proffer any evidence refuting Mr. Cadigan's testimony or his spreadsheet, which demonstrates that Elemica deactivated 1,132 of the Specific Maps before the expiration of the Rollout Agreement. *See* Ex. 17 at "Summary" tab; Ex. 19, p.18, l.15 – p. 19, l.2.

Instead, Elemica asserts that ecMarket's deletion of certain Elemica data following the end of the parties' contractual relationship prevents confirmation that the Specific Maps were removed

prior to the expiration of the Rollout Agreement. *See* Mot. at 5. This statement is misleading and demonstrably false.

Mr. Cadigan explained he relied upon the data in the monthly billing reports and invoices ***provided to Elemica*** during the term of the Rollout Agreement to determine which Specific Maps were removed from the Production Environment and when the removal took place. *See* Ex. 18, p.30, ll.2-15; Ex. 19, p.5, ll.2-23, p.21, ll.9-15. ecMarket provided this information to Elemica during the parties' contractual relationship and produced it again during discovery. *See* Ex. 20.

Elemica also asserts that ecMarket had to "approve" Elemica's requests to deactivate trading partners. *See* Mot. at 5. This is misleading. While Elemica did not have the ability to deactivate trading partners on its own, ecMarket would not have to "approve" any such request. *See* Ex. 22 (the Affidavit of John Cadigan) at ¶ 15. Putting aside the parties' agreement as to the Specific Maps, Elemica could and did submit requests to the mapping department requesting to deactivate "maps." *Id*. Those requests would have been routinely fulfilled by ecMarket's mapping department without seeking approval from ecMarket management. *Id.*

D. ecMarket Removed Certain Elemica Data For
Security Purposes In The Ordinary Course Of Its Business

Without a supporting citation, Elemica states there "can be no confirmation as to the specific trading partners that were removed prior to the expiration of the Rollout Agreement" because ecMarket "removed its Elemica database and it cannot be restored." *See* Mot. at 5.  There is no support for Elemica's bald conclusory statement because it is not accurate.

As explained in Mr. Cadigan's affidavit, ecMarket's deletion of certain data in the ordinary course of its business did not destroy relevant evidence that prevents ecMarket from proving the removal of the Specific Maps. *See* Ex. 22 (Affidavit of John Cadigan). More specifically, Mr. Cadigan relied upon billing reports and invoices generated ***during the parties' contractual***

8

*relationship* and extracted from ecMarket's ERPLink Database **prior to** any deactivations or deletions of any "Elemica Data." *Id.*, ¶¶ 11-13. Thus, the billing reports are an original, reliable source of evidence – evidence that ecMarket provided to Elemica during the parties' relationship and yet again in discovery. *Id.*, ¶¶ 11, 12.[2]

E.   The Muse Email Is Sent To All Elemica Customers Using Conexiom

In early November 2021, ecMarket sent a series of marketing emails to a handful of its own prospective customers who were using Conexiom through Elemica at that time.  Exhibit E to the Motion reflects those emails being sent by ecMarket only to six (6) of its prospective customers.

In response, on November 9, 2021, Elemica's then CEO (David Muse) sent his defamatory email to over one-hundred and fifty (150) individuals at all thirty-eight (38) of the customers using Conexiom at that time through Elemica. *See* Ex. 24 (Elemica's 2nd Amend. Resp. to ecMarket's First Set of Interrogs.), at pp. 8-12. In its March 28, 2023 Opinion, the Court found at least three statements in the Muse Email actionable as defamation *per se*. *See* Dkt.51 at 7-9. Elemica does not suggest or argue otherwise. Rather, it seeks summary judgment because ecMarket allegedly cannot prove reputational harm caused by those defamatory statements. *See* Mot. at 3.

III.   **Argument**

A.   ecMarket Need Not Prove Special Damages Or Reputational Harm

Relying primarily on a single case from the Delaware Superior Court - *Preston Hollow Capital LLC v. Nuveen LLC*, 2022 Del. Super. LEXIS 264 (Del. Super. June 14, 2022) ("Preston") - Elemica asserts it is entitled to summary judgment on ecMarket's defamation claim because

---

[2] Elemica also suggests that an adverse inference is appropriate because ecMarket failed to put an official "litigation hold" in place. *See* Mot. at 12. Elemica, however, neglects to inform the Court that ecMarket's retention policy for email communications is "set to infinite," and thus the lack of an official "litigation hold" did not limit ecMarket's search and production of all relevant and responsive documents. *See* Ex. 18, p.15, l. 23 – p. 16, l.10, p.16, l.23 – p. 17, l.15; Ex. 19, p.25, ll.8-24. Thus, there was no prejudice to Elemica due to the lack of an official "litigation hold."

ecMarket has not yet demonstrated special damages or reputational harm. Elemica is wrong. The Delaware Supreme Court and multiple other decisions from the Delaware Superior Court have held that a plaintiff need not prove special damages or reputational harm to obtain a judgment for defamation *per se* and recover nominal, compensatory and/or punitive damages.

In the seminal case of *Spence v. Funk*, the Delaware Supreme Court explained why damages are presumed when a party makes a defamatory statement maligning one's trade, business, or profession.

> "The precise reason why the law presumes damages … is unclear, but each seems to involve circumstances to which it would be difficult to trace specific financial loss. [internal citation omitted] … One who is defamed in one of these ways might never know the extent of a lost opportunity to relate to and associate with others, because he could be avoided without knowing the reason and without having a chance to rebut the defamation."

396 A.2d 967, 970 (Del. 1978).

Further, the "scope of liability for libel is generally broader than for slander." *Id.* Relying on a prior Delaware Supreme Court decision in *Rice v. Simmons*, 2 Harr. 417 (Del. 1836), the *Spence* court noted that protection against libel is broader than that it is against slander because:

> "(1) the written word leaves a more permanent blot on one's reputation; (2) the written word is capable of wider circulation than that which is communicated orally; [and] (3) reducing a defamation to writing evidences greater deliberation and intention on the part of one who records it. While that analysis was made long ago by our highest Court, it remains generally valid today. The general rule is that any publication which is libelous on its face is actionable without pleading or proof of special damages. ***In other words, proof of damage proximately caused by a publication deemed to be libelous need not be shown in order for a defamed plaintiff to recover nominal or compensatory damages.***"

*Id.* (emphasis added).[3]

---

[3] In closing, the *Spence* court "recognize[d] that some of the Trial Court opinions may be confusing, but this Court has never departed from or diluted the ruling of *Rice v. Simmons*. It is the law in Delaware and any decision to the contrary is expressly overruled." *Id.* at 972.

Shortly after its decision in *Spence v. Funk,* the Delaware Supreme Court reinforced:

"[w]ith respect to actual damages, it is the law of Delaware that proof of damage proximately caused by a publication deemed to be libelous need not be shown in order for a defamed plaintiff to recover nominal or compensatory damages. This is true whether the defamatory nature is apparent on the face of the statement or can be ascertained only by reference to extrinsic facts. Therefore, as long as the jury finds that Dr. Kanaga is the victim of libel, she can recover actual damages. The amount, of course, is for the jury.

*Kanaga v. Gannett Co.*, 687 A.2d 173, 182-3 (Del. 1996) ("Kanaga I"). Still further, a jury can

award a defamed plaintiff punitive damages if it demonstrates that the defendant acted with

reckless disregard for the truth of the published statements or with knowledge that the statements

were false. *Id.* at 183. In a subsequent ruling in *Kanaga*, the Delaware Supreme Court expressly

noted that the presumption of damages with respect to statements that "malign one in a trade,

business or profession" can lead to a separate "humiliation award" by the jury even without

evidence of reputational harm. *Gannett Co. v. Kanaga*, 750 A.2d 1174, 1184 (Del. 1998) ("Kanaga

II").

The majority of Delaware Superior and Chancery Court cases have appropriately applied

the law set forth by the Delaware Supreme Court in *Spence* and *Kanaga*. *See e.g.*, *Prof'l

Investigating & Consulting Agency, Inc. v. Hewlett-Packard Co.* ("*PICA*"), 2014 Del. Super

LEXIS 458 (Del. Super. September 3, 2014) (denying defendant's motion for summary judgment

on defamation claim); *Del. Express Shuttle v. Older*, 2002 Del. Ch. LEXIS 124, *85-87 (Del. Ch.

Oct. 23, 2002) (lack of demonstrating reputational harm does not mean that an element of the tort

of defamation *per se* has not been established or no damages are to be awarded). The Delaware

Superior Court's decision in *PICA* is particularly instructive and persuasive.

In *PICA*, the plaintiff ("PICA") alleged that employees of defendant (Hewlett-Packard

Company ("HP")) made defamatory statements to PICA's clients that maligned PICA's business

performance and reputation. *See PICA*, at *28-29. In response to HP's motion for summary judgment, PICA argued that it could recover humiliation damages even without proving that the comments directly or proximately caused the loss of business. *Id.* at *31. In denying HP's motion for summary judgment, the *PICA* court looked for guidance from both *Kanaga II* and *Spence*:

> "In [*Kanaga II*], the Delaware Supreme Court found that 'under Delaware law, injury to reputation is permitted without proof of special damages.' The [*Kanaga II*] Court looked to *Spence v. Funk*, which established that there is a presumption of damages with respect to defamatory statements that 'malign one in a trade, business or profession.' The jury in *Kanaga* awarded $2.6 million dollars for 'actual damages,' without distinguishing humiliation damages from economic damages. The *Kanaga* Court found that the presumption established in *Spence v. Funk* would have sustained a '**separate** humiliation award in this case had one been rendered.'"

*Id.* (emphasis added). The *PICA* court held PICA had established a *prima facie* case of defamation and need not prove economic injury where the "defamatory [] statements malign PICA's trade or business, because damages are presumed under the circumstances." *Id.* at *32.

The *Preston* court conceded that harm to one's reputation would "normally be presumed to flow" from a defamatory *per se* statement, but still held a plaintiff must provide evidence of diminution in reputation. *Preston,* at *8-9. This holding is **not** supported by Delaware law nor would it be fair to force a defamed plaintiff like ecMarket to "trace specific financial loss" where "one who is defamed [by a *per se* defamatory statement] might never know the extent of a lost opportunity to relate to and associate with others, because he could be avoided without knowing the reason and without having a chance to rebut the defamation." *See Spence*, 396 A.2d at 970.[4]

---

[4] Elemica also cites *Q-Tone Broadcasting, Co. v. Musicradio*. *See* Mot. at 7. However, in denying the defendants' motion to dismiss, the *Q-Tone* court found that allegedly defamatory *per se* statements supported a *prima facie* case of libel, and therefore, the "Court need not reach the issue of Plaintiffs' special damages."  1994 Del. Super. LEXIS 453 at *18-19  (Del. Super. Aug. 22, 1994).

At trial, ecMarket will demonstrate that Elemica's defamatory *per se* statements maligning ecMarket's business were false and made with reckless disregard for their truth.   Summary judgment should be denied, and the jury should determine the appropriate damages.

B.    Elemica Agreed Not To Deactivate The Specific Maps

ecMarket agreed to provide a discount to Elemica contingent upon Elemica ***not*** removing the Specific Maps from the Production Environment. Elemica also ***agreed*** not to deactivate the Specific Maps, as reflected in Mr. Squillacioti's April 9, 2019 email to Mark Toffoli and confirmed during discovery by Elemica's own witnesses, who testified that the deal reached by the parties on April 9, 2019 never changed. Other than Amendment #6, the documents and deposition testimony do ***not*** support Elemica's claim that it was entitled to a discount regardless as to whether the Specific Maps remained in the Production Environment.

Elemica ignores the evidence obtained through discovery and seeks summary judgment on ecMarket's breach of contract claim.  However, this evidence cannot and should not be ignored. Indeed, Amendment #6 is not a fully integrated contract, and thus the Court can consider extrinsic evidence to determine the parties' full and complete agreement – an agreement breached by Elemica.

ecMarket respects this Court's initial finding that the term "1,300" is unambiguous. *See* Dkt. 51 at 5.  However, the evidence obtained through discovery revealed and confirmed that the term "1,300" was a reference to the Specific Maps that Elemica ***agreed*** not to deactivate in exchange for receiving a discount. The deal reached via email on April 9, 2019 never changed before the parties executed Amendment #6. Even Elemica's own in-house counsel (who signed Amendment #6 on behalf of Elemica) after receiving the draft addendum wrote back to "confirm that ***the*** 1300 Dorman[] Maps is [sic] counted as in Production…" *See* Ex. 6.

Elemica not only ignores this undisputed evidence, but it also asks the Court to do the same so that Elemica receives a windfall result. The Court, however, may consider extrinsic evidence that supplements a contract when, as is the case here, the contract is not completely integrated. *See McKinney Family L.P. v. Stubbs*, 2007 Del. LEXIS 291, *6 n.9 (Del. July 2, 2007) (internal quotation omitted) (parol evidence rule does not prohibit "supplementation of partially integrated contracts by evidence of an oral agreement that is consistent with, and does not contradict, the writing.") "The parol evidence rule attaches legal consequences to an integrated contract—a contract that is the only agreement between the parties on a specific topic." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 212 (3rd Cir. 2022). Amendment #6 was not the only agreement reached by the parties relating to the Specific Maps.

In determining whether a writing proposed as a contract is totally integrated, several factors are considered including: "(i) the parties' intent, to the extent it is discernible, (ii) the language of the contract, including any integration clause, (iii) whether the contract carefully and formally was drafted, (iv) the time the parties had to consider the contract's terms, (v) whether the parties bargained over specific terms, and (vi) whether the contract addresses questions that naturally arise out of the subject matter. *James v. United Med. LLC,* 2017 Del. Super. LEXIS 161, *13 (Del. Super. Mar. 31, 2017); *see also Taylor v. Jones*, 2002 Del. Ch. LEXIS 152, *12 (Del. Ch. Dec. 17, 2002) (court considered conflicting extrinsic evidence even though writing, on its face, appeared complete).

Neither Amendment #6 nor the underlying Rollout Agreement contain an integration clause. *See* Mot. at Exs. C, D. ***All*** the evidence of the prior negotiations leading to the execution of Amendment #6 is set forth through the email communications leading to Elemica's written confirmation that it agreed to "Option 1." *See* Ex. 5. There is no evidence in the record supporting

14

any reason why ecMarket would agree to provide a blanket discount to Elemica or why Elemica would be entitled to such a discount without regard to the deactivation of the Specific Maps set forth in Elemica's own April 1, 2019 excel spreadsheet. *See* Ex. 3. The "complete expression" of the parties' agreement ***includes*** the email communications that accompanied ecMarket's delivery of the proposed draft addendum. *See* Ex. 6; *see also Stubbs,* 2007 Del. LEXIS 291 at *6 (admitting map attached to written portion of agreement to supplement terms in the writing). Elemica cannot point to any evidence in the record to the contrary.

Amendment #6 is not a fully integrated contract, as it does not contain all of the parties' bargained for specific terms nor does it answer the questions that have naturally arisen when Elemica deactivated the Specific Maps. While 1,300 may be a static number, the Court can consider whether that static number corresponded to the Specific Maps and whether the parties intended to agree (and did, in fact, agree) that Elemica would not deactivate those Specific Maps. The evidence in the record demonstrates there was no mutual assent for Amendment #6 to be the complete and accurate integration of the parties' agreement. Considering the evidence of the parties' actual intent, ecMarket has, at a minimum, demonstrated that there is a genuine issue of material fact precluding summary judgment on ecMarket's claim for breach of contract.

C.   Conexiom Did Not Waive Elemica's Contractual Obligation
     Not To Deactivate The Specific Maps In The Production Environment

Elemica argues that ecMarket waived the requirement that Elemica not deactivate the Specific Maps. There is not, however, evidence that ecMarket intentionally relinquished its right to enforce this material term in the parties' agreement. At minimum, there is a genuine issue of material fact as to whether ecMarket intended to waive this requirement.

"It is well settled in Delaware that a party may waive contractual requirements or conditions." *Bantum v. New Castle County Vo-Tech, Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011). "But

15

the standards for demonstrating waiver – are 'quite exacting.'" *Id.* (citing *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.,* 871 A.2d 428, 444 (Del. 2005). Waiver implies knowledge of all material facts and an intent to waive, as well as a willingness to refrain from enforcing those rights. *Id.* The three elements of the waiver doctrine are: (1) a requirement or condition capable of being waived; (2) the waiving party knows of that requirement or condition; and (3) the waiving party intends to waive that requirement or condition. *Id.* "The facts relied upon to demonstrate waiver must be unequivocal." *Id*.

Elemica argues that ecMarket intended to waive this requirement because it alone had the ability to deactivate a trading partner and because ecMarket had to "approve" Elemica's deactivation requests. *See* Mot. at 11. However, Elemica's *ex post facto* description of the parties' relationship and what occurred in practice does not withstand scrutiny. There is no dispute that Elemica had thousands of trading partners, i.e., "SpokeCos," in ecMarket's Production Environment. *See* Ex. 13. At times, Elemica would submit deactivation requests to ecMarket's mapping department. *See* Ex. 22, ¶ 15. In the normal and ordinary course, those working in the mapping department would routinely fulfill those requests without seeking approval from anyone within management at ecMarket. *Id.* There is no evidence that it was incumbent upon ecMarket to ensure that Elemica did not deactivate the Specific Maps. The responsibilities of those ecMarket employees in the mapping department would be to fulfill Elemica's deactivation requests in the normal course and not question Elemica's right to do so. *Id.* The mapping department's fulfillment of an Elemica request to deactivate a Specific Map was, at most, inadvertent. It is not evidence of an ***intentional*** relinquishment of Elemica's obligation not to deactivate the Specific Maps.

Elemica's reliance on internal ecMarket emails in October and November 2020 (*see* Mot. at Ex. P) belies Elemica's argument. Those communications further evidence the parties'

agreement that a specific list of SpokeCos would remain in the Production Environment because otherwise "if an order came in for a deactivated spokeco, the order would be lost." *Id.* at ECM 054 (Halverson 11/9/20 email at 7:26 p.m.). In that same email chain, Brent Halverson confirmed the intent of Amendment #6 was to "negotiate[] a one time arrangement for ***so many spokecos*** where we would not have to deactivate any of ***them***, an[d] orders [for these spokecos] would still get processed. [Halverson] considered low risk any orders would come in for ***these spokecos***." *Id.* (emphasis added). Nothing in these internal email communications evidence an intent to waive the requirement for "these spokecos" to remain in ecMarket's Production Environment.

While ecMarket may not have immediately recognized that Elemica was breaching the agreement by initiating the deactivation of most of the Specific Maps, ecMarket's delayed recognition of the breach does not equate to an intentional relinquishment of its right to enforce the parties' agreement. At minimum, whether ecMarket intended to waive this requirement is a factual dispute, and Delaware courts have held that it is for the trier of fact to decide whether the waiving party's conduct evidenced an intentional, conscious, and voluntary abandonment of its claim or right. *See George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224 (Del. 1975); *see also AeroGlobal Capital Mgmt., LLC v. Cirrus Indus.*, 871 A.2d 428, 446 (Del. 2005) ("where the inference and ultimate fact to be established concerns intent or other subjective reaction, summary judgment is ordinarily inappropriate.")

D.    There Was No Spoliation Of "Critical Evidence" By ecMarket

Elemica seeks an undefined "adverse inference" because ecMarket deleted certain Elemica data, which Elemica argues is "critical evidence." *See* Mot. at 12-13. Elemica asserts the evidence in the database is "relevant … because there is no documentary evidence of who requested trading partners to be deactivated, when the deactivations occurred, who performed the deactivations, or which trading partners were deactivated, if any." *Id.* at 12. Elemica's claim is demonstrably untrue.

"Spoliation occurs where: [1] the evidence was in the party's control, [2] the evidence is relevant to the claims and defenses in the case, [3] there has been actual suppression or withholding of evidence, and [4] the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). Sanctionable spoliation requires the party moving for the adverse interest show that the other party acted in bad faith. *Id.* at 79. "Such an adverse presumption or inference arises only when the spoliation or destruction of evidence was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent." *Id.*

Pursuant to Federal Rule of Civil Procedure 37(e)(2), an adverse inference for the failure to preserve electronically stored information is only appropriate when, *inter alia,* the allegedly lost information cannot be restored or replaced through additional discovery, a party has been prejudiced and "upon a finding that the party acted with the intent to deprive another party of the information's use in the litigation . . ." *See* Fed. R. Civ. P. 37(e)(2). Here, there is no evidence of any intent to suppress the truth, there is no unfair prejudice to Elemica and there is evidence proffered supporting ecMarket's claims.

During discovery, ecMarket produced an excel spreadsheet detailing the number of Specific Maps deactivated, which Specific Maps were deactivated and when those deactivations occurred. *See* Ex. 17. Mr. Cadigan explained the data in his spreadsheet, what it meant and the source documents he used to obtain the relevant information and perform his analysis. *See* Ex. 22, ¶ 10. Those source documents included billing reports and invoices that ecMarket sent to Elemica during the term of the parties' contractual relationship and produced again during this litigation. *Id.,* ¶¶ 10, 12. Thus, there is concrete, undisputed evidence in the record demonstrating: (i) which Specific Maps were deactivated; (ii) when those Specific Maps were deactivated; (iii) who

18

requested the deactivations of the Specific Maps; and (iv) who fulfilled Elemica's deactivation requests. Elemica has not proffered any evidence disputing these facts.

ecMarket's deletion of certain Elemica data was done in the ordinary course of its business and for legitimate business reasons including, but not limited to, avoiding the risk of a data breach. As explained in the Cadigan Affidavit, ecMarket maintained a "colocation facility," which was an off-site facility, i.e., a data center, containing ecMarket computers configured to provide the *Conexiom* solution to all of ecMarket's clients including Elemica. *See* Ex. 22, ¶ 3. There was one main database (the "ERPLink Database") located at this facility for servicing *all* of ecMarket's clients. *Id.* Within the ERPLink Database, there was a logical separation for data particular to Elemica (the "Elemica Data"). *Id.*

In or around July 2021, ecMarket started a customer migration from the Colocation Data Center to the Azure Cloud. *Id.,* ¶ 4. That customer migration to the Azure Cloud was not fully completed until March 2023. *Id.* The Elemica Data was not part of that migration. *Id.,* ¶ 5.

On or about March 1, 2022, at the end of the parties' contractual relationship, ecMarket deactivated the Elemica portals within the ERPLink Database. *Id.* In or around July 2022, after the normal three (3) month retention period and to minimize data breach risk, ecMarket deleted the Elemica Data from the ERPLink Database. *Id.* The Elemica Data included documents that Elemica and/or its customers had previously provided to ecMarket for the purpose of having ecMarket extract information from the purchase orders and deliver that information to Elemica for additional transformation. *Id.* Until approximately July 2023, ecMarket maintained a "back up file" of the Elemica Data deleted from the ERPLink Database. *Id.*, ¶ 6.

Critically, the original billing reports and invoices used to create ecMarket's spreadsheet (Ex. 17) had been extracted from the ERPLink Database *before* any deactivation, deletion, or

destruction of any Elemica Data. *Id., ¶ 13.* Thus, Elemica has not been prejudiced by the deletion of the Elemica Data. Moreover, Elemica could proffer evidence of its own (through testimony, email communications or otherwise) that it did not request the deactivation of most of the Specific Maps, but it has not done so. To date, however, Elemica has made no effort to determine whether it deactivated the Specific Maps. *See* Ex. 7 (Delizia), p. 148, l.24 – p. 149, l.8.

Elemica seeks an "adverse inference," but fails to demonstrate any fraudulent intent by ecMarket (as there was none), explain what that adverse inference would be or what critical evidence benefitting Elemica could ***only*** be found within the Elemica Data. Elemica could also proffer its own evidence that it did not deactivate most of the Specific Maps but has not done so. Elemica has not demonstrated spoliation or an entitlement to an adverse inference and Elemica's request for any adverse inference should be denied.

     E.    <u>Elemica Breached The Parties' Agreement</u>

At trial, ecMarket will demonstrate that Elemica owes ecMarket $318,926.27 for outstanding invoices not yet paid in full. *See* Exs. 12, 13 & 15. Elemica does not dispute that calculation in its Motion nor does Elemica proffer any evidence that it has paid ecMarket in full even under Elemica's interpretation of the parties' agreement.

Assuming *arguendo* that Elemica can demonstrate at trial that it was entitled to a discount under all circumstances (which it was not), Elemica still breached the parties' agreement and owes ecMarket $20,330.10. *See* Exs. 15, 16. In any event, Elemica is not entitled to summary judgment on ecMarket's breach of contract claim.

Dated:  April 29, 2024

**K&L GATES LLP**

<u>/s/ Steven L. Caponi</u>
Steven L. Caponi (No. 3484)
Megan E. O'Connor (No. 6569)
600 N. King Street, Suite 901
Wilmington, DE  19801

Phone:  (302) 416-7000
steven.caponi@klgates.com
megan.oconnor@klgates.com

*Of Counsel*:

Richard A. Saldinger
LANDSMAN SALDINGER
   CARROLL, PLLC
161 N. Clark Street, Suite 1600
Chicago, IL  60601
Phone:  (312) 667-1359
saldinger@lsclegal.com

*Counsel for Defendant ecMarket, Inc.*